IN THE MATTER OF BABY M, A PSEUDONYM FOR
AN ACTUAL PERSON.

Argued September 14, 1987—Decided February 3, 1988.

398

402

*Harold J. Cassidy* and *Alan J. Karcher* argued the cause for appellants, Mary Beth and Richard Whitehead (*Cassidy, Foss & San Filippo,* attorneys; *Harold J. Cassidy, Alan J. Karcher, Robert W. Ruggieri, Randolph H. Wolf,* and *Louis N. Rainone,* on the briefs).

*Gary N. Skoloff* argued the cause for respondents, William and Elizabeth Stern (*Skoloff & Wolfe,* attorneys; *Gary N. Skoloff, Francis W. Donahue,* and *Edward J. O'Donnell,* on the brief).

*Lorraine A. Abraham,* Guardian *ad litem,* argued the cause pro se (*Lorraine A. Abraham,* attorney; *Lorraine A. Abraham* and *Steven T. Kearns,* on the brief).

*Annette M. Tobia* submitted a brief on behalf of *amicus curiae* Dr. Betsy P. Aigen, (*Spivak & Tobia,* attorneys).

*George B. Gelman* submitted a brief on behalf of *amicus curiae* American Adoption Congress (*Gelman & McNish,* attorneys).

*Steven N. Taieb* and *Steven F. McDowell,* a member of the Wisconsin bar, submitted a brief on behalf of *amicus curiae* Catholic League for Religious and Civil Rights.

*Steven P. Weissman* submitted a brief on behalf of *amicus curiae* Communications Workers of America, AFL–CIO.

*John R. Holsinger, Merrill O'Brien, Mary Sue Henifin,* and *John H. Hall,* and *Terry E. Thornton,* members of the New York bar, submitted a brief on behalf of *amicus curiae* Concerned United Birthparents, Inc. (*Ellenport & Holsinger,* attorneys).

*David H. Dugan, III,* and *Joy R. Jowdy,* a member of the Texas bar, submitted a brief on behalf of *amici curiae* Concerned Women for America, Eagle Forum, National Legal Foundation, Family Research Council of America, United Families Foundation, and Judicial Reform Project.

*Alfred F. Russo* and *Andrew C. Kimbrell,* a member of the Pennsylvania bar, and *Edward Lee Rogers,* a member of the District of Columbia bar, submitted a brief on behalf of *amici curiae* The Foundation on Economic Trends, Jeremy Rifkin, Betty Friedan, Gloria Steinem, Gena Corea, Barbara Katz-Rothman, Lois Gould, Marilyn French, Hazel Henderson, Grace Paley, Evelyn Fox Keller, Shelly Mindin, Rita Arditti, Dr. Janice Raymond, Dr. Michelle Harrison, Dr. W.D. White, Sybil Shainwald, Mary Daly, Cathleen Lahay, Karen Malpede, Phylis Chesler, Kristen Golden, Letty Cottin Pogrebin, and Ynestra King (*Russo & Casey,* attorneys).

*Louis E. Della Torre, Jr.,* submitted a brief on behalf of *amicus curiae* The Gruter Institute for Law and Behavioral Research, Inc. (*Schumann, Hession, Kennelly & Dorment,* attorneys).

*Kathleen E. Kitson, Sharon F. Liebhaber,* and *Myra Sun,* a member of the Washington bar, submitted a brief on behalf of *amici curiae* Hudson County Legal Services Corporation and National Center on Women and Family Law, Inc. (*Timothy K. Madden,* Director, Hudson County Legal Services Corporation, attorney).

*Priscilla Read Chenoweth* submitted a brief on behalf of *amici curiae* Committee for Mother and Child Rights, Inc. and Origins.

*Herbert D. Hinkle* submitted a brief on behalf of *amicus curiae* National Association of Surrogate Mothers.

*Joseph M. Nardi, Jr.,* and *Edward F. Canfield,* a member of the District of Columbia bar, submitted a brief on behalf of *amicus curiae* The National Committee for Adoption, Inc. (*Lario, Nardi & Gleaner,* attorneys).

*Charlotte Rosin, pro se,* submitted a letter in lieu of brief on behalf of *amicus curiae* National Infertility Network Exchange.

*William F. Bolan, Jr.,* submitted a brief on behalf of *amicus curiae* New Jersey Catholic Conference.

*Paul J. McCurrie* and *Cyril C. Means, Jr.,* a member of the Michigan bar, with whom Priscilla Read Chenoweth and Cathleen M. Halko were on the brief, submitted a brief on behalf of *amici curiae* Odyssey Institute International, Inc., Odyssey Institute of Connecticut, Inc., Florence Fisher, Judianne Densen–Gerber, Senator Connie Binsfeld, and Angela Holder.

*Merrilee A. Scilla, pro se,* submitted a letter in lieu of brief on behalf of *amicus curiae* RESOLVE of Central New Jersey.

*Jerrold N. Kaminsky* submitted a brief on behalf of *amicus curiae* RESOLVE, Inc.

*Richard J. Traynor* and *John W. Whitehead,* a member of the Virginia bar, and *David A. French,* a member of the Michigan bar, submitted a brief on behalf of *amicus curiae* The Rutherford Institute (*Traynor and Hogan,* attorneys).

*Nadine Taub* submitted a brief on behalf of *amici curiae* Women's Rights Litigation Clinic at Rutgers Law School, The New York State Coalition on Women's Legislative Issues, and the National Emergency Civil Liberties Committee.

## Table of Contents

| | Introduction | 410 |
| I. | Facts | 411 |
| II. | Invalidity and Unenforceability of Surrogacy Contract | 421 |
| | A. Conflict with Statutory Provisions | 423 |
| | B. Public Policy Considerations | 434 |
| III. | Termination | 444 |
| IV. | Constitutional Issues | 447 |
| V. | Custody | 452 |
| VI. | Visitation | 463 |
| | Conclusion | 468 |

The opinion of the Court was delivered by

WILENTZ, C.J.

In this matter the Court is asked to determine the validity of a contract that purports to provide a new way of bringing children into a family. For a fee of $10,000, a woman agrees to be artificially inseminated with the semen of another woman's husband; she is to conceive a child, carry it to term, and after its birth surrender it to the natural father and his wife. The intent of the contract is that the child's natural mother will thereafter be forever separated from her child. The wife is to adopt the child, and she and the natural father are to be

regarded as its parents for all purposes. The contract providing for this is called a "surrogacy contract," the natural mother inappropriately called the "surrogate mother."

We invalidate the surrogacy contract because it conflicts with the law and public policy of this State. While we recognize the depth of the yearning of infertile couples to have their own children, we find the payment of money to a "surrogate" mother illegal, perhaps criminal, and potentially degrading to women. Although in this case we grant custody to the natural father, the evidence having clearly proved such custody to be in the best interests of the infant, we void both the termination of the surrogate mother's parental rights and the adoption of the child by the wife/stepparent. We thus restore the "surrogate" as the mother of the child. We remand the issue of the natural mother's visitation rights to the trial court, since that issue was not reached below and the record before us is not sufficient to permit us to decide it *de novo*.

We find no offense to our present laws where a woman voluntarily and without payment agrees to act as a "surrogate" mother, provided that she is not subject to a binding agreement to surrender her child. Moreover, our holding today does not preclude the Legislature from altering the current statutory scheme, within constitutional limits, so as to permit surrogacy contracts. Under current law, however, the surrogacy agreement before us is illegal and invalid.

## I.

## FACTS

In February 1985, William Stern and Mary Beth Whitehead entered into a surrogacy contract. It recited that Stern's wife, Elizabeth, was infertile, that they wanted a child, and that Mrs. Whitehead was willing to provide that child as the mother with Mr. Stern as the father.

The contract provided that through artificial insemination using Mr. Stern's sperm, Mrs. Whitehead would become pregnant, carry the child to term, bear it, deliver it to the Sterns, and thereafter do whatever was necessary to terminate her maternal rights so that Mrs. Stern could thereafter adopt the child. Mrs. Whitehead's husband, Richard,[1] was also a party to the contract; Mrs. Stern was not. Mr. Whitehead promised to do all acts necessary to rebut the presumption of paternity under the Parentage Act. *N.J.S.A.* 9:17–43a(1), –44a. Although Mrs. Stern was not a party to the surrogacy agreement, the contract gave her sole custody of the child in the event of Mr. Stern's death. Mrs. Stern's status as a nonparty to the surrogate parenting agreement presumably was to avoid the application of the baby-selling statute to this arrangement. *N.J.S.A.* 9:3–54.

Mr. Stern, on his part, agreed to attempt the artificial insemination and to pay Mrs. Whitehead $10,000 after the child's birth, on its delivery to him. In a separate contract, Mr. Stern agreed to pay $7,500 to the Infertility Center of New York ("ICNY"). The Center's advertising campaigns solicit surrogate mothers and encourage infertile couples to consider surrogacy. ICNY arranged for the surrogacy contract by bringing the parties together, explaining the process to them, furnishing the contractual form,[2] and providing legal counsel.

The history of the parties' involvement in this arrangement suggests their good faith. William and Elizabeth Stern were

---

[1]Subsequent to the trial court proceedings, Mr. and Mrs. Whitehead were divorced, and soon thereafter Mrs. Whitehead remarried. Nevertheless, in the course of this opinion we will make reference almost exclusively to the facts as they existed at the time of trial, the facts on which the decision we now review was reached. We note moreover that Mr. Whitehead remains a party to this dispute. For these reasons, we continue to refer to appellants as Mr. and Mrs. Whitehead.

[2]The Stern–Whitehead contract (the "surrogacy contract") and the Stern–ICNY contract are reproduced below as Appendices A and B respectively. Other ancillary agreements and their attachments are omitted.

married in July 1974, having met at the University of Michigan, where both were Ph.D. candidates. Due to financial considerations and Mrs. Stern's pursuit of a medical degree and residency, they decided to defer starting a family until 1981. Before then, however, Mrs. Stern learned that she might have multiple sclerosis and that the disease in some cases renders pregnancy a serious health risk. Her anxiety appears to have exceeded the actual risk, which current medical authorities assess as minimal. Nonetheless that anxiety was evidently quite real, Mrs. Stern fearing that pregnancy might precipitate blindness, paraplegia, or other forms of debilitation. Based on the perceived risk, the Sterns decided to forego having their own children. The decision had special significance for Mr. Stern. Most of his family had been destroyed in the Holocaust. As the family's only survivor, he very much wanted to continue his bloodline.

Initially the Sterns considered adoption, but were discouraged by the substantial delay apparently involved and by the potential problem they saw arising from their age and their differing religious backgrounds. They were most eager for some other means to start a family.

The paths of Mrs. Whitehead and the Sterns to surrogacy were similar. Both responded to advertising by ICNY. The Sterns' response, following their inquiries into adoption, was the result of their long-standing decision to have a child. Mrs. Whitehead's response apparently resulted from her sympathy with family members and others who could have no children (she stated that she wanted to give another couple the "gift of life"); she also wanted the $10,000 to help her family.

Both parties, undoubtedly because of their own self-interest, were less sensitive to the implications of the transaction than they might otherwise have been. Mrs. Whitehead, for instance, appears not to have been concerned about whether the Sterns would make good parents for her child; the Sterns, on their part, while conscious of the obvious possibility that surrender-

ing the child might cause grief to Mrs. Whitehead, overcame their qualms because of their desire for a child. At any rate, both the Sterns and Mrs. Whitehead were committed to the arrangement; both thought it right and constructive.

Mrs. Whitehead had reached her decision concerning surrogacy before the Sterns, and had actually been involved as a potential surrogate mother with another couple. After numerous unsuccessful artificial inseminations, that effort was abandoned. Thereafter, the Sterns learned of the Infertility Center, the possibilities of surrogacy, and of Mary Beth Whitehead. The two couples met to discuss the surrogacy arrangement and decided to go forward. On February 6, 1985, Mr. Stern and Mr. and Mrs. Whitehead executed the surrogate parenting agreement. After several artificial inseminations over a period of months, Mrs. Whitehead became pregnant. The pregnancy was uneventful and on March 27, 1986, Baby M was born.

Not wishing anyone at the hospital to be aware of the surrogacy arrangement, Mr. and Mrs. Whitehead appeared to all as the proud parents of a healthy female child. Her birth certificate indicated her name to be Sara Elizabeth Whitehead and her father to be Richard Whitehead. In accordance with Mrs. Whitehead's request, the Sterns visited the hospital unobtrusively to see the newborn child.

Mrs. Whitehead realized, almost from the moment of birth, that she could not part with this child. She had felt a bond with it even during pregnancy. Some indication of the attachment was conveyed to the Sterns at the hospital when they told Mrs. Whitehead what they were going to name the baby. She apparently broke into tears and indicated that she did not know if she could give up the child. She talked about how the baby looked like her other daughter, and made it clear that she was experiencing great difficulty with the decision.

Nonetheless, Mrs. Whitehead was, for the moment, true to her word. Despite powerful inclinations to the contrary, she

turned her child over to the Sterns on March 30 at the White-heads' home.

The Sterns were thrilled with their new child. They had planned extensively for its arrival, far beyond the practical furnishing of a room for her. It was a time of joyful celebra-tion—not just for them but for their friends as well. The Sterns looked forward to raising their daughter, whom they named Melissa. While aware by then that Mrs. Whitehead was undergoing an emotional crisis, they were as yet not cognizant of the depth of that crisis and its implications for their newly-enlarged family.

Later in the evening of March 30, Mrs. Whitehead became deeply disturbed, disconsolate, stricken with unbearable sad-ness. She had to have her child. She could not eat, sleep, or concentrate on anything other than her need for her baby. The next day she went to the Sterns' home and told them how much she was suffering.

The depth of Mrs. Whitehead's despair surprised and fright-ened the Sterns. She told them that she could not live without her baby, that she must have her, even if only for one week, that thereafter she would surrender her child. The Sterns, concerned that Mrs. Whitehead might indeed commit suicide, not wanting under any circumstances to risk that, and in any event believing that Mrs. Whitehead would keep her word, turned the child over to her. It was not until four months later, after a series of attempts to regain possession of the child, that Melissa was returned to the Sterns, having been forcibly re-moved from the home where she was then living with Mr. and Mrs. Whitehead, the home in Florida owned by Mary Beth Whitehead's parents.

The struggle over Baby M began when it became apparent that Mrs. Whitehead could not return the child to Mr. Stern. Due to Mrs. Whitehead's refusal to relinquish the baby, Mr. Stern filed a complaint seeking enforcement of the surrogacy contract. He alleged, accurately, that Mrs. Whitehead had not

only refused to comply with the surrogacy contract but had threatened to flee from New Jersey with the child in order to avoid even the possibility of his obtaining custody. The court papers asserted that if Mrs. Whitehead were to be given notice of the application for an order requiring her to relinquish custody, she would, prior to the hearing, leave the state with the baby. And that is precisely what she did. After the order was entered, *ex parte*, the process server, aided by the police, in the presence of the Sterns, entered Mrs. Whitehead's home to execute the order. Mr. Whitehead fled with the child, who had been handed to him through a window while those who came to enforce the order were thrown off balance by a dispute over the child's current name.

The Whiteheads immediately fled to Florida with Baby M. They stayed initially with Mrs. Whitehead's parents, where one of Mrs. Whitehead's children had been living. For the next three months, the Whiteheads and Melissa lived at roughly twenty different hotels, motels, and homes in order to avoid apprehension. From time to time Mrs. Whitehead would call Mr. Stern to discuss the matter; the conversations, recorded by Mr. Stern on advice of counsel, show an escalating dispute about rights, morality, and power, accompanied by threats of Mrs. Whitehead to kill herself, to kill the child, and falsely to accuse Mr. Stern of sexually molesting Mrs. Whitehead's other daughter.

Eventually the Sterns discovered where the Whiteheads were staying, commenced supplementary proceedings in Florida, and obtained an order requiring the Whiteheads to turn over the child. Police in Florida enforced the order, forcibly removing the child from her grandparents' home. She was soon thereafter brought to New Jersey and turned over to the Sterns. The prior order of the court, issued *ex parte*, awarding custody of the child to the Sterns *pendente lite*, was reaffirmed by the trial court after consideration of the certified representations of the parties (both represented by counsel) concerning the unusual sequence of events that had unfolded. Pending final

judgment, Mrs. Whitehead was awarded limited visitation with Baby M.

The Sterns' complaint, in addition to seeking possession and ultimately custody of the child, sought enforcement of the surrogacy contract. Pursuant to the contract, it asked that the child be permanently placed in their custody, that Mrs. Whitehead's parental rights be terminated, and that Mrs. Stern be allowed to adopt the child, *i.e.*, that, for all purposes, Melissa become the Sterns' child.

The trial took thirty-two days over a period of more than two months. It included numerous interlocutory appeals and attempted interlocutory appeals. There were twenty-three witnesses to the facts recited above and fifteen expert witnesses, eleven testifying on the issue of custody and four on the subject of Mrs. Stern's multiple sclerosis; the bulk of the testimony was devoted to determining the parenting arrangement most compatible with the child's best interests. Soon after the conclusion of the trial, the trial court announced its opinion from the bench. 217 *N.J.Super.* 313 (1987). It held that the surrogacy contract was valid; ordered that Mrs. Whitehead's parental rights be terminated and that sole custody of the child be granted to Mr. Stern; and, after hearing brief testimony from Mrs. Stern, immediately entered an order allowing the adoption of Melissa by Mrs. Stern, all in accordance with the surrogacy contract. Pending the outcome of the appeal, we granted a continuation of visitation to Mrs. Whitehead, although slightly more limited than the visitation allowed during the trial.

Although clearly expressing its view that the surrogacy contract was valid, the trial court devoted the major portion of its opinion to the question of the baby's best interests. The inconsistency is apparent. The surrogacy contract calls for the surrender of the child to the Sterns, permanent and sole custody in the Sterns, and termination of Mrs. Whitehead's parental rights, all without qualification, all regardless of any evaluation

of the best interests of the child. As a matter of fact the contract recites (even before the child was conceived) that it is in the best interests of the child to be placed with Mr. Stern. In effect, the trial court awarded custody to Mr. Stern, the natural father, based on the same kind of evidence and analysis as might be expected had no surrogacy contract existed. Its rationalization, however, was that while the surrogacy contract was valid, specific performance would not be granted unless that remedy was in the best interests of the child. The factual issues confronted and decided by the trial court were the same as if Mr. Stern and Mrs. Whitehead had had the child out of wedlock, intended or unintended, and then disagreed about custody. The trial court's awareness of the irrelevance of the contract in the court's determination of custody is suggested by its remark that beyond the question of the child's best interests, "[a]ll other concerns raised by counsel constitute commentary." 217 *N.J.Super.* at 323.

On the question of best interests—and we agree, but for different reasons, that custody was the critical issue—the court's analysis of the testimony was perceptive, demonstrating both its understanding of the case and its considerable experience in these matters. We agree substantially with both its analysis and conclusions on the matter of custody.

The court's review and analysis of the surrogacy contract, however, is not at all in accord with ours. The trial court concluded that the various statutes governing this matter, including those concerning adoption, termination of parental rights, and payment of money in connection with adoptions, do not apply to surrogacy contracts. *Id.* at 372–73. It reasoned that because the Legislature did not have surrogacy contracts in mind when it passed those laws, those laws were therefore irrelevant. *Ibid.* Thus, assuming it was writing on a clean slate, the trial court analyzed the interests involved and the power of the court to accommodate them. It then held that surrogacy contracts are valid and should be enforced, *id.* at

388, and furthermore that Mr. Stern's rights under the surrogacy contract were constitutionally protected. *Id.* at 385–88.

Mrs. Whitehead appealed. This Court granted direct certification. 107 *N.J.* 140 (1987). The briefs of the parties on appeal were joined by numerous briefs filed by *amici* expressing various interests and views on surrogacy and on this case. We have found many of them helpful in resolving the issues before us.

Mrs. Whitehead contends that the surrogacy contract, for a variety of reasons, is invalid. She contends that it conflicts with public policy since it guarantees that the child will not have the nurturing of both natural parents—presumably New Jersey's goal for families. She further argues that it deprives the mother of her constitutional right to the companionship of her child, and that it conflicts with statutes concerning termination of parental rights and adoption. With the contract thus void, Mrs. Whitehead claims primary custody (with visitation rights in Mr. Stern) both on a best interests basis (stressing the "tender years" doctrine) as well as on the policy basis of discouraging surrogacy contracts. She maintains that even if custody would ordinarily go to Mr. Stern, here it should be awarded to Mrs. Whitehead to deter future surrogacy arrangements.

In a brief filed after oral argument, counsel for Mrs. Whitehead suggests that the standard for determining best interests where the infant resulted from a surrogacy contract is that the child should be placed with the mother absent a showing of unfitness. All parties agree that no expert testified that Mary Beth Whitehead was unfit as a mother; the trial court expressly found that she was *not* "unfit," that, on the contrary, "she is a good mother for and to her older children," 217 *N.J.Super.* at 397; and no one now claims anything to the contrary.

One of the repeated themes put forth by Mrs. Whitehead is that the court's initial *ex parte* order granting custody to the Sterns during the trial was a substantial factor in the ultimate

"best interests" determination. That initial order, claimed to be erroneous by Mrs. Whitehead, not only established Melissa as part of the Stern family, but brought enormous pressure on Mrs. Whitehead. The order brought the weight of the state behind the Sterns' attempt, ultimately successful, to gain possession of the child. The resulting pressure, Mrs. Whitehead contends, caused her to act in ways that were atypical of her ordinary behavior when not under stress, and to act in ways that were thought to be inimical to the child's best interests in that they demonstrated a failure of character, maturity, and consistency. She claims that any mother who truly loved her child might so respond and that it is doubly unfair to judge her on the basis of her reaction to an extreme situation rarely faced by any mother, where that situation was itself caused by an erroneous order of the court. Therefore, according to Mrs. Whitehead, the erroneous *ex parte* order precipitated a series of events that proved instrumental in the final result.[3]

The Sterns claim that the surrogacy contract is valid and should be enforced, largely for the reasons given by the trial court. They claim a constitutional right of privacy, which includes the right of procreation, and the right of consenting adults to deal with matters of reproduction as they see fit. As for the child's best interests, their position is factual: given all of the circumstances, the child is better off in their custody with no residual parental rights reserved for Mrs. Whitehead.

Of considerable interest in this clash of views is the position of the child's guardian *ad litem*, wisely appointed by the court at the outset of the litigation. As the child's representative, her role in the litigation, as she viewed it, was solely to protect the child's best interests. She therefore took no position on the validity of the surrogacy contract, and instead.

---

[3]Another argument advanced by Mrs. Whitehead is that the surrogacy agreement violates state wage regulations, *N.J.S.A.* 34:11–4.7, and the Minimum Wage Standard Act, *N.J.S.A.* 34:11–56a to –56a30. Given our disposition of the matter, we need not reach those issues.

devoted her energies to obtaining expert testimony uninfluenced by any interest other than the child's. We agree with the guardian's perception of her role in this litigation. She appropriately refrained from taking any position that might have appeared to compromise her role as the child's advocate. She first took the position, based on her experts' testimony, that the Sterns should have primary custody, and that while Mrs. Whitehead's parental rights should not be terminated, no visitation should be allowed for five years. As a result of subsequent developments, mentioned *infra*, her view has changed. She now recommends that no visitation be allowed at least until Baby M reaches maturity.

Although some of the experts' opinions touched on visitation, the major issue they addressed was whether custody should be reposed in the Sterns or in the Whiteheads. The trial court, consistent in this respect with its view that the surrogacy contract was valid, did not deal at all with the question of visitation. Having concluded that the best interests of the child called for custody in the Sterns, the trial court enforced the operative provisions of the surrogacy contract, terminated Mrs. Whitehead's parental rights, and granted an adoption to Mrs. Stern. Explicit in the ruling was the conclusion that the best interests determination removed whatever impediment might have existed in enforcing the surrogacy contract. This Court, therefore, is without guidance from the trial court on the visitation issue, an issue of considerable importance in any event, and especially important in view of our determination that the surrogacy contract is invalid.

## II.

## INVALIDITY AND UNENFORCEABILITY OF SURROGACY CONTRACT

We have concluded that this surrogacy contract is invalid. Our conclusion has two bases: direct conflict with existing

statutes and conflict with the public policies of this State, as expressed in its statutory and decisional law.

■ One of the surrogacy contract's basic purposes, to achieve the adoption of a child through private placement, though permitted in New Jersey "is very much disfavored." *Sees v. Baber*, 74 *N.J.* 201, 217 (1977). Its use of money for this purpose—and we have no doubt whatsoever that the money is being paid to obtain an adoption and not, as the Sterns argue, for the personal services of Mary Beth Whitehead—is illegal and perhaps criminal. *N.J.S.A.* 9:3–54. In addition to the inducement of money, there is the coercion of contract: the natural mother's irrevocable agreement, prior to birth, even prior to conception, to surrender the child to the adoptive couple. Such an agreement is totally unenforceable in private placement adoption. *Sees*, 74 *N.J.* at 212–14. Even where the adoption is through an approved agency, the formal agreement to surrender occurs only *after* birth (as we read *N.J.S.A.* 9:2–16 and –17, and similar statutes), and then, by regulation, only after the birth mother has been offered counseling. *N.J.A.C.* 10:121A–5.4(c). Integral to these invalid provisons of the surrogacy contract is the related agreement, equally invalid, on the part of the natural mother to cooperate with, and not to contest, proceedings to terminate her parental rights, as well as her contractual concession, in aid of the adoption, that the child's best interests would be served by awarding custody to the natural father and his wife—all of this before she has even conceived, and, in some cases, before she has the slightest idea of what the natural father and adoptive mother are like.

The foregoing provisions not only directly conflict with New Jersey statutes, but also offend long-established State policies. These critical terms, which are at the heart of the contract, are invalid and unenforceable; the conclusion therefore follows, without more, that the entire contract is unenforceable.

## A. Conflict with Statutory Provisions

The surrogacy contract conflicts with: (1) laws prohibiting the use of money in connection with adoptions; (2) laws requiring proof of parental unfitness or abandonment before termination of parental rights is ordered or an adoption is granted; and (3) laws that make surrender of custody and consent to adoption revocable in private placement adoptions.

■ (1) Our law prohibits paying or accepting money in connection with any placement of a child for adoption. *N.J.S.A.* 9:3–54a. Violation is a high misdemeanor. *N.J.S.A.* 9:3–54c. Excepted are fees of an approved agency (which must be a non-profit entity, *N.J.S.A.* 9:3–38a) and certain expenses in connection with childbirth. *N.J.S.A.* 9:3–54b.[4]

Considerable care was taken in this case to structure the surrogacy arrangement so as not to violate this prohibition. The arrangement was structured as follows: the adopting parent, Mrs. Stern, was not a party to the surrogacy contract; the money paid to Mrs. Whitehead was stated to be for her services—not for the adoption; the sole purpose of the contract was stated as being that "of giving a child to William Stern, its natural and biological father"; the money was purported to be

---

[4]*N.J.S.A.* 9:3–54 reads as follows:

 a. No person, firm, partnership, corporation, association or agency shall make, offer to make or assist or participate in any placement for adoption and in connection therewith

 (1) Pay, give or agree to give any money or any valuable consideration, or assume or discharge any financial obligation; or

 (2) Take, receive, accept or agree to accept any money or any valuable consideration.

 b. The prohibition of subsection a. shall not apply to the fees or services of any approved agency in connection with a placement for adoption, nor shall such prohibition apply to the payment or reimbursement of medical, hospital or other similar expenses incurred in connection with the birth or any illness of the child, or to the acceptance of such reimbursement by a parent of the child.

 c. Any person, firm, partnership, corporation, association or agency violating this section shall be guilty of a high misdemeanor.

"compensation for services and expenses and in no way ... a fee for termination of parental rights or a payment in exchange for consent to surrender a child for adoption"; the fee to the Infertility Center ($7,500) was stated to be for legal representation, advice, administrative work, and other "services." Nevertheless, it seems clear that the money was paid and accepted in connection with an adoption.

The Infertility Center's major role was first as a "finder" of the surrogate mother whose child was to be adopted, and second as the arranger of all proceedings that led to the adoption. Its role as adoption finder is demonstrated by the provision requiring Mr. Stern to pay another $7,500 if he uses Mary Beth Whitehead again as a surrogate, and by ICNY's agreement to "coordinate arrangements for the adoption of the child by the wife." The surrogacy agreement requires Mrs. Whitehead to surrender Baby M for the purposes of adoption. The agreement notes that Mr. *and Mrs.* Stern wanted to have a child, and provides that the child be "placed" with Mrs. Stern in the event Mr. Stern dies before the child is born. The payment of the $10,000 occurs only on surrender of custody of the child and "completion of the duties and obligations" of Mrs. Whitehead, including termination of her parental rights to facilitate adoption by Mrs. Stern. As for the contention that the Sterns are paying only for services and not for an adoption, we need note only that they would pay nothing in the event the child died before the fourth month of pregnancy, and only $1,000 if the child were stillborn, even though the "services" had been fully rendered. Additionally, one of Mrs. Whitehead's estimated costs, to be assumed by Mr. Stern, was an "Adoption Fee," presumably for Mrs. Whitehead's incidental costs in connection with the adoption.

Mr. Stern knew he was paying for the adoption of a child; Mrs. Whitehead knew she was accepting money so that a child might be adopted; the Infertility Center knew that it was being paid for assisting in the adoption of a child. The actions of all three worked to frustrate the goals of the statute. It strains

credulity to claim that these arrangements, touted by those in the surrogacy business as an attractive alternative to the usual route leading to an adoption, really amount to something other than a private placement adoption for money.

The prohibition of our statute is strong. Violation constitutes a high misdemeanor, *N.J.S.A.* 9:3–54c, a third-degree crime, *N.J.S.A.* 2C:43–1b, carrying a penalty of three to five years imprisonment. *N.J.S.A.* 2C:43–6a(3). The evils inherent in baby-bartering are loathsome for a myriad of reasons. The child is sold without regard for whether the purchasers will be suitable parents. N. Baker, *Baby Selling: The Scandal of Black Market Adoption* 7 (1978). The natural mother does not receive the benefit of counseling and guidance to assist her in making a decision that may affect her for a lifetime. In fact, the monetary incentive to sell her child may, depending on her financial circumstances, make her decision less voluntary. *Id.* at 44. Furthermore, the adoptive parents [5] may not be fully informed of the natural parents' medical history.

Baby-selling potentially results in the exploitation of all parties involved. *Ibid.* Conversely, adoption statutes seek to further humanitarian goals, foremost among them the best interests of the child. H. Witmer, E. Herzog, E. Weinstein, & M. Sullivan, *Independent Adoptions: A Follow–Up Study* 32 (1967). The negative consequences of baby-buying are potentially present in the surrogacy context, especially the potential for placing and adopting a child without regard to the interest of the child or the natural mother.

■■■■ (2) The termination of Mrs. Whitehead's parental rights, called for by the surrogacy contract and actually ordered by the court, 217 *N.J.Super.* at 399–400, fails to comply

---

[5] Of course, here there are no "adoptive parents," but rather the natural father and his wife, the only adoptive parent. As noted, however, many of the dangers of using money in connection with adoption may exist in surrogacy situations.

with the stringent requirements of New Jersey law. Our law, recognizing the finality of any termination of parental rights, provides for such termination only where there has been a voluntary surrender of a child to an approved agency or to the Division of Youth and Family Services ("DYFS"), accompanied by a formal document acknowledging termination of parental rights, *N.J.S.A.* 9:2–16, –17; *N.J.S.A.* 9:3–41; *N.J.S.A.* 30:4C–23, or where there has been a showing of parental abandonment or unfitness. A termination may ordinarily take one of three forms: an action by an approved agency, an action by DYFS, or an action in connection with a private placement adoption. The three are governed by separate statutes, but the standards for termination are substantially the same, except that whereas a written surrender is effective when made to an approved agency or to DYFS, there is no provision for it in the private placement context. *See N.J.S.A.* 9:2–14; *N.J.S.A.* 30:4C–23.

*N.J.S.A.* 9:2–18 to –20 governs an action by an approved agency to terminate parental rights. Such an action, whether or not in conjunction with a pending adoption, may proceed on proof of written surrender, *N.J.S.A.* 9:2–16, –17, "forsaken parental obligation," or other specific grounds such as death or insanity, *N.J.S.A.* 9:2–19. Where the parent has not executed a formal consent, termination requires a showing of "forsaken parental obligation," *i.e.*, "willful and continuous neglect or failure to perform the natural and regular obligations of care and support of a child." *N.J.S.A.* 9:2–13(d). *See also N.J.S.A.* 9:3–46a, –47c.

Where DYFS is the agency seeking termination, the requirements are similarly stringent, although at first glance they do not appear to be so. DYFS can, as can any approved agency, accept a formal voluntary surrender or writing having the effect of termination and giving DYFS the right to place the child for adoption. *N.J.S.A.* 30:4C–23. Absent such formal written surrender and consent, similar to that given to approved agencies, DYFS can terminate parental rights in an

action for guardianship by proving that "the best interests of such child require that he be placed under proper guardianship." *N.J.S.A.* 30:4C–20. Despite this "best interests" language, however, this Court has recently held in *New Jersey Div. of Youth & Family Servs. v. A.W.*, 103 *N.J.* 591 (1986), that in order for DYFS to terminate parental rights it must prove, by clear and convincing evidence, that "[t]he child's health and development have been or will be seriously impaired by the parental relationship," *id.* at 604, that "[t]he parents are unable or unwilling to eliminate the harm and delaying permanent placement will add to the harm," *id.* at 605, that "[t]he court has considered alternatives to termination," *id.* at 608, and that "[t]he termination of parental rights will not do more harm than good," *id.* at 610. This interpretation of the statutory language requires a most substantial showing of harm to the child if the parental relationship were to continue, far exceeding anything that a "best interests" test connotes.

In order to terminate parental rights under the private placement adoption statute, there must be a finding of "intentional abandonment or a very substantial neglect of parental duties without a reasonable expectation of a reversal of that conduct in the future." *N.J.S.A.* 9:3–48c(1). This requirement is similar to that of the prior law (*i.e.*, "forsaken parental obligations," *L.*1953, *c.* 264, § 2(d) (codified at *N.J.S.A.* 9:3–18(d) (repealed))), and to that of the law providing for termination through actions by approved agencies, *N.J.S.A.* 9:2–13(d). *See also In re Adoption by J.J.P.*, 175 *N.J.Super.* 420, 427 (App. Div.1980) (noting that the language of the termination provision in the present statute, *N.J.S.A.* 9:3–48c(1), derives from this Court's construction of the prior statute in *In re Adoption of Children by D.*, 61 *N.J.* 89, 94–95 (1972)).

In *Sees v. Baber*, 74 *N.J.* 201 (1977) we distinguished the requirements for terminating parental rights in a private placement adoption from those required in an approved agency adoption. We stated that in an unregulated private placement, "neither consent nor voluntary surrender is singled out as a

statutory factor in terminating parental rights." *Id.* at 213. *Sees* established that without proof that parental obligations had been forsaken, there would be no termination in a private placement setting.

█ As the trial court recognized, without a valid termination there can be no adoption. *In re Adoption of Children by D.,* *supra,* 61 *N.J.* at 95. This requirement applies to all adoptions, whether they be private placements, *ibid.,* or agency adoptions, *N.J.S.A.* 9:3–46a, –47c.

█ Our statutes, and the cases interpreting them, leave no doubt that where there has been no written surrender to an approved agency or to DYFS, termination of parental rights will not be granted in this state absent a very strong showing of abandonment or neglect. *See, e.g., Sorentino v. Family & Children's Soc'y of Elizabeth,* 74 *N.J.* 313 (1977) (*Sorentino II* ); *Sees v. Baber,* 74 *N.J.* 201 (1977); *Sorentino v. Family & Children's Soc'y of Elizabeth,* 72 *N.J.* 127 (1976) (*Sorentino I* ); *In re Adoption of Children by D., supra,* 61 *N.J.* 89. That showing is required in every context in which termination of parental rights is sought, be it an action by an approved agency, an action by DYFS, or a private placement adoption proceeding, even where the petitioning adoptive parent is, as here, a stepparent. While the statutes make certain procedural allowances when stepparents are involved, *N.J.S.A.* 9:3–48a(2), –48a(4), –48c(4), the substantive requirement for terminating the natural parents' rights is not relaxed one iota. *N.J.S.A.* 9:3–48c(1); *In re Adoption of Children by D., supra,* 61 *N.J.* at 94–95; *In re Adoption by J.J.P., supra,* 175 *N.J.Super.* at 426–28; *In re N.,* 96 *N.J.Super.* 415, 423–27 (App.Div.1967). It is clear that a "best interests" determination is never sufficient to terminate parental rights; the statutory criteria must be

proved.[6]

In this case a termination of parental rights was obtained not by proving the statutory prerequisites but by claiming the benefit of contractual provisions. From all that has been stated above, it is clear that a contractual agreement to abandon one's parental rights, or not to contest a termination action, will not be enforced in our courts. The Legislature would not have so carefully, so consistently, and so substantially restricted termination of parental rights if it had intended to allow termination to be achieved by one short sentence in a contract.

Since the termination was invalid,[7] it follows, as noted above, that adoption of Melissa by Mrs. Stern could not properly be granted.

(3) The provision in the surrogacy contract stating that Mary Beth Whitehead agrees to "surrender custody ... and terminate all parental rights" contains no clause giving her a right to rescind. It is intended to be an irrevocable consent to surrender the child for adoption—in other words, an irrevocable

---

[6]Counsel for the Sterns argues that the Parentage Act empowers the court to terminate parental rights solely on the basis of the child's best interests. He cites *N.J.S.A.* 9:17–53c, which reads, in pertinent part, as follows:

> The judgment or order may contain any other provision directed against the appropriate party to the proceeding concerning the duty of support, the custody and guardianship of the child, visitation privileges with the child, the furnishing of bond or other security for the payment of the judgment, the repayment of any public assistance grant, or *any other matter in the best interests of the child.* [Emphasis supplied].

We do not interpret this section as in any way altering or diluting the statutory prerequisites to termination discussed above. Termination of parental rights differs qualitatively from the matters to which this section is expressly directed, and, in any event, we have no doubt that if the Legislature had intended a substantive change in the standards governing an area of such gravity, it would have said so explicitly.

[7]We conclude not only that the surrogacy contract is an insufficient basis for termination, but that no statutory or other basis for termination existed. See *infra* at 444–447.

commitment by Mrs. Whitehead to turn Baby M over to the Sterns and thereafter to allow termination of her·parental rights. The trial court required a "best interests" showing as a condition to granting specific performance of the surrogacy contract. 217 *N.J.Super.* at 399–400. Having decided the "best interests" issue in favor of the Sterns, that court's order included, among other things, specific performance of this agreement to surrender custody and terminate all parental rights.

Mrs. Whitehead, shortly after the child's birth, had attempted to revoke her consent and surrender by refusing, after the Sterns had allowed her to have the child "just for one week," to return Baby M to them. The trial court's award of specific performance therefore reflects its view that the consent to surrender the child was irrevocable. We accept the trial court's construction of the contract; indeed it appears quite clear that this was the parties' intent. Such a provision, however, making irrevocable the natural mother's consent to surrender custody of her child in a private placement adoption, clearly conflicts with New Jersey law.

Our analysis commences with the statute providing for surrender of custody to an approved agency and termination of parental rights on the suit of that agency. The two basic provisions of the statute are *N.J.S.A.* 9:2–14 and 9:2–16. The former provides explicitly that

[e]xcept as otherwise provided by law or by order or judgment of a court of competent jurisdiction or by testamentary disposition, no surrender of the custody of a child shall be valid in this state unless made to an approved agency pursuant to the provisions of this act....

There is no exception "provided by law," and it is not clear that there could be any "order or judgment of a court of competent jurisdiction" validating a surrender of custody as a basis for adoption when that surrender was not in conformance with the statute. Requirements for a voluntary surrender to an approved agency are set forth in *N.J.S.A.* 9:2–16. This section allows an approved agency to take a voluntary surrender of

custody from the parent of a child but provides stringent requirements as a condition to its validity. The surrender must be in writing, must be in such form as is required for the recording of a deed, and, pursuant to *N.J.S.A.* 9:2–17, must

> be such as to declare that the person executing the same desires to relinquish the custody of the child, acknowledge the termination of parental rights as to such custody in favor of the approved agen. *v*, and acknowledge full understanding of the effect of such surrender as provided by this act.

If the foregoing requirements are met, the consent, the voluntary surrender of custody

> shall be valid whether or not the person giving same is a minor and shall be irrevocable except at the discretion of the approved agency taking such surrender or upon order or judgment of a court of competent jurisdiction, setting aside such surrender upon proof of fraud, duress, or misrepresentation. [*N.J.S.A.* 9:2–16.]

The importance of that irrevocability is that the surrender itself gives the agency the power to obtain termination of parental rights—in other words, permanent separation of the parent from the child, leading in the ordinary case to an adoption. *N.J.S.A.* 9:2–18 to –20.

This statutory pattern, providing for a surrender in writing and for termination of parental rights by an approved agency, is generally followed in connection with adoption proceedings and proceedings by DYFS to obtain permanent custody of a child. Our adoption statute repeats the requirements necessary to accomplish an irrevocable surrender to an approved agency in both form and substance. *N.J.S.A.* 9:3–41a. It provides that the surrender "shall be valid and binding without regard to the age of the person executing the surrender," *ibid.*; and although the word "irrevocable" is not used, that seems clearly to be the intent of the provision. The statute speaks of such surrender as constituting "relinquishment of such person's parental rights in or guardianship or custody of the child *named therein* and consent by such person to adoption of the child." *Ibid.* (emphasis supplied). We emphasize "named therein," for we construe the statute to allow a surrender only after the birth of the child. The formal consent

to surrender enables the approved agency to terminate parental rights.

Similarly, DYFS is empowered to "take voluntary surrenders and releases of custody and consents to adoption[s]" from parents, which surrenders, releases, or consents "when properly acknowledged ... shall be valid and binding irrespective of the age of the person giving the same, and shall be irrevocable except at the discretion of the Bureau of Childrens Services [currently DYFS] or upon order of a court of competent jurisdiction." *N.J.S.A.* 30:4C–23. Such consent to surrender of the custody of the child would presumably lead to an adoption placement by DYFS. *See N.J.S.A.* 30:4C–20.

It is clear that the Legislature so carefully circumscribed all aspects of a consent to surrender custody—its form and substance, its manner of execution, and the agency or agencies to which it may be made—in order to provide the basis for irrevocability. It seems most unlikely that the Legislature intended that a consent not complying with these requirements would also be irrevocable, especially where, as here, that consent falls radically short of compliance. Not only do the form and substance of the consent in the surrogacy contract fail to meet statutory requirements, but the surrender of custody is made to a private party. It is not made, as the statute requires, either to an approved agency or to DYFS.

These strict prerequisites to irrevocability constitute a recognition of the most serious consequences that flow from such consents: termination of parental rights, the permanent separation of parent from child, and the ultimate adoption of the child. *See Sees v. Baber, supra,* 74 *N.J.* at 217. Because of those consequences, the Legislature severely limited the circumstances under which such consent would be irrevocable. The legislative goal is furthered by regulations requiring approved agencies, prior to accepting irrevocable consents, to provide advice and counseling to women, making it more likely that they fully

understand and appreciate the consequences of their acts. *N.J. A.C.* 10:121A–5.4(c).

Contractual surrender of parental rights is not provided for in our statutes as now written. Indeed, in the Parentage Act, *N.J.S.A.* 9:17–38 to –59, there is a specific provision invalidating any agreement "between an alleged or presumed father and the mother of the child" to bar an action brought for the purpose of determining paternity "[r]egardless of [the contract's] terms." *N.J.S.A.* 9:17–45. Even a settlement agreement concerning parentage reached in a judicially-mandated consent conference is not valid unless the proposed settlement is approved beforehand by the court. *N.J.S.A.* 9:17–48c and d. There is no doubt that a contractual provision purporting to constitute an irrevocable agreement to surrender custody of a child for adoption is invalid.

In *Sees v. Baber, supra,* 74 *N.J.* 201, we noted that a natural mother's consent to surrender her child and to its subsequent adoption was no longer *required* by the statute in private placement adoptions. After tracing the statutory history from the time when such a consent had been an essential prerequisite to adoption, we concluded that such a consent was now neither necessary nor sufficient for the purpose of terminating parental rights. *Id.* at 213. The consent to surrender custody in that case was in writing, had been executed prior to physical surrender of the infant, and had been explained to the mother by an attorney. The trial court found that the consent to surrender of custody in that private placement adoption was knowing, voluntary, and deliberate. *Id.* at 216. The physical surrender of the child took place four days after its birth. Two days thereafter the natural mother changed her mind, and asked that the adoptive couple give her baby back to her. We held that she was entitled to the baby's return. The effect of our holding in that case necessarily encompassed our conclusion that "in an unsupervised private placement, since there is no statutory obligation to consent, there can be no legal barrier to its retraction." *Id.* at 215. The only possible relevance of

consent in these matters, we noted, was that it *might* bear on whether there had been an abandonment of the child, or a forsaking of parental obligations. *Id.* at 216. Otherwise, consent in a private placement adoption is not only revocable but, when revoked early enough, irrelevant. *Id.* at 213–15.

 The provision in the surrogacy contract whereby the mother irrevocably agrees to surrender custody of her child and to terminate her parental rights conflicts with the settled interpretation of New Jersey statutory law.[8] There is only one irrevocable consent, and that is the one explicitly provided for by statute: a consent to surrender of custody and a placement with an approved agency or with DYFS. The provision in the surrogacy contract, agreed to before conception, requiring the natural mother to surrender custody of the child without any right of revocation is one more indication of the essential nature of this transaction: the creation of a contractual system of termination and adoption designed to circumvent our statutes.

## B. Public Policy Considerations

 The surrogacy contract's invalidity, resulting from its direct conflict with the above statutory provisions, is further underlined when its goals and means are measured against New Jersey's public policy. The contract's basic premise, that the natural parents can decide in advance of birth which one is to have custody of the child, bears no relationship to the settled law that the child's best interests shall determine custody. *See Fantony v. Fantony*, 21 *N.J.* 525, 536–37 (1956); *see also Sheehan v. Sheehan*, 38 *N.J.Super.* 120, 125 (App.Div.1955)

---

[8]The surrogacy situation, of course, differs from the situation in *Sees*, in that here there is no "adoptive couple," but rather the natural father and the stepmother, who is the would-be adoptive mother. This difference, however, does not go to the basis of the *Sees* holding. In both cases, the determinative aspect is the vulnerability of the natural mother who decides to surrender her child in the absence of institutional safeguards.

("Whatever the agreement of the parents, the ultimate determination of custody lies with the court in the exercise of its supervisory jurisdiction as *parens patriae.*"). The fact that the trial court remedied that aspect of the contract through the "best interests" phase does not make the contractual provision any less offensive to the public policy of this State.

The surrogacy contract guarantees permanent separation of the child from one of its natural parents. Our policy, however, has long been that to the extent possible, children should remain with and be brought up by both of their natural parents. That was the first stated purpose of the previous adoption act, *L.*1953, *c.* 264, § 1, codified at *N.J.S.A.* 9:3-17 (repealed): "it is necessary and desirable (a) to protect the child from unnecessary separation from his natural parents...." While not so stated in the present adoption law, this purpose remains part of the public policy of this State. *See, e.g., Wilke .v. Culp,* 196 *N.J.Super.* 487, 496 (App.Div.1984), certif. den., 99 *N.J.* 243 (1985); *In re Adoption by J.J.P., supra,* 175 *N.J.Super.* at 426. This is not simply some theoretical ideal that in practice has no meaning. The impact of failure to follow that policy is nowhere better shown than in the results of this surrogacy contract. A child, instead of starting off its life with as much peace and security as possible, finds itself immediately in a tug-of-war between contending mother and father.[9]

The surrogacy contract violates the policy of this State that the rights of natural parents are equal concerning their child, the father's right no greater than the mother's. "The parent

---

[9]And the impact on the natural parents, Mr. Stern and Mrs. Whitehead, is severe and dramatic. The depth of their conflict about Baby M, about custody, visitation, about the goodness or badness of each of them, comes through in their telephone conversations, in which each tried to persuade the other to give up the child. The potential adverse consequences of surrogacy are poignantly captured here—Mrs. Whitehead threatening to kill herself and the baby, Mr. Stern begging her not to, each blaming the other. The dashed hopes of the Sterns, the agony of Mrs. Whitehead, their suffering, their hatred—all were caused by the unraveling of this arrangement.

and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents." *N.J.S.A.* 9:17–40. As the Assembly Judiciary Committee noted in its statement to the bill, this section establishes "the principle that regardless of the marital status of the parents, all children *and all parents* have equal rights with respect to each other." *Statement to Senate No. 888*, Assembly Judiciary, Law, Public Safety and Defense Committee (1983) (emphasis supplied). The whole purpose and effect of the surrogacy contract was to give the father the exclusive right to the child by destroying the rights of the mother.

The policies expressed in our comprehensive laws governing consent to the surrender of a child, discussed *supra* at 429–434, stand in stark contrast to the surrogacy contract and what it implies. Here there is no counseling, independent or otherwise, of the natural mother, no evaluation, no warning.

The only legal advice Mary Beth Whitehead received regarding the surrogacy contract was provided in connection with the contract that she previously entered into with another couple. Mrs. Whitehead's lawyer was referred to her by the Infertility Center, with which he had an agreement to act as counsel for surrogate candidates. His services consisted of spending one hour going through the contract with the Whiteheads, section by section, and answering their questions. Mrs. Whitehead received no further legal advice prior to signing the contract with the Sterns.

Mrs. Whitehead was examined and psychologically evaluated, but if it was for her benefit, the record does not disclose that fact. The Sterns regarded the evaluation as important, particularly in connection with the question of whether she would change her mind. Yet they never asked to see it, and were content with the assumption that the Infertility Center had made an evaluation and had concluded that there was no danger that the surrogate mother would change her mind. From Mrs. Whitehead's point of view, all that she learned from

the evaluation was that "she had passed." It is apparent that the profit motive got the better of the Infertility Center. Although the evaluation was made, it was not put to any use, and understandably so, for the psychologist warned that Mrs. Whitehead demonstrated certain traits that might make surrender of the child difficult and that there should be further inquiry into this issue in connection with her surrogacy. To inquire further, however, might have jeopardized the Infertility Center's fee. The record indicates that neither Mrs. Whitehead nor the Sterns were ever told of this fact, a fact that might have ended their surrogacy arrangement.

Under the contract, the natural mother is irrevocably committed before she knows the strength of her bond with her child. She never makes a totally voluntary, informed decision, for quite clearly any decision prior to the baby's birth is, in the most important sense, uninformed, and any decision after that, compelled by a pre-existing contractual commitment, the threat of a lawsuit, and the inducement of a $10,000 payment, is less than totally voluntary. Her interests are of little concern to those who controlled this transaction.

Although the interest of the natural father and adoptive mother is certainly the predominant interest, realistically the *only* interest served, even they are left with less than what public policy requires. They know little about the natural mother, her genetic makeup, and her psychological and medical history. Moreover, not even a superficial attempt is made to determine their awareness of their responsibilities as parents.

Worst of all, however, is the contract's total disregard of the best interests of the child. There is not the slightest suggestion that any inquiry will be made at any time to determine the fitness of the Sterns as custodial parents, of Mrs. Stern as an adoptive parent, their superiority to Mrs. Whitehead, or the effect on the child of not living with her natural mother.

This is the sale of a child, or, at the very least, the sale of a mother's right to her child, the only mitigating factor being

that one of the purchasers is the father. Almost every evil that prompted the prohibition on the payment of money in connection with adoptions exists here.

The differences between an adoption and a surrogacy contract should be noted, since it is asserted that the use of money in connection with surrogacy does not pose the risks found where money buys an adoption. Katz, "Surrogate Motherhood and the Baby–Selling Laws," 20 *Colum.J.L. & Soc.Probs.* 1 (1986).

First, and perhaps most important, all parties concede that it is unlikely that surrogacy will survive without money. Despite the alleged selfless motivation of surrogate mothers, if there is no payment, there will be no surrogates, or very few. That conclusion contrasts with adoption; for obvious reasons, there remains a steady supply, albeit insufficient, despite the prohibitions against payment. The adoption itself, relieving the natural mother of the financial burden of supporting an infant, is in some sense the equivalent of payment.

Second, the use of money in adoptions does not *produce* the problem—conception occurs, and usually the birth itself, before illicit funds are offered. With surrogacy, the "problem," if one views it as such, consisting of the purchase of a woman's procreative capacity, at the risk of her life, is caused by and originates with the offer of money.

Third, with the law prohibiting the use of money in connection with adoptions, the built-in financial pressure of the unwanted pregnancy and the consequent support obligation do not lead the mother to the highest paying, ill-suited, adoptive parents. She is just as well-off surrendering the child to an approved agency. In surrogacy, the highest bidders will presumably become the adoptive parents regardless of suitability, so long as payment of money is permitted.

Fourth, the mother's consent to surrender her child in adoptions is revocable, even after surrender of the child, unless it be to an approved agency, where by regulation there are protec-

tions against an ill-advised surrender. In surrogacy, consent occurs so early that no amount of advice would satisfy the potential mother's need, yet the consent is irrevocable.

The main difference, that the unwanted pregnancy is unintended while the situation of the surrogate mother is voluntary and intended, is really not significant. Initially, it produces stronger reactions of sympathy for the mother whose pregnancy was unwanted than for the surrogate mother, who "went into this with her eyes wide open." On reflection, however, it appears that the essential evil is the same, taking advantage of a woman's circumstances (the unwanted pregnancy or the need for money) in order to take away her child, the difference being one of degree.

In the scheme contemplated by the surrogacy contract in this case, a middle man, propelled by profit, promotes the sale. Whatever idealism may have motivated any of the participants, the profit motive predominates, permeates, and ultimately governs the transaction. The demand for children is great and the supply small. The availability of contraception, abortion, and the greater willingness of single mothers to bring up their children has led to a shortage of babies offered for adoption. *See* N. Baker, *Baby Selling: The Scandal of Black Market Adoption, supra; Adoption and Foster Care, 1975: Hearings on Baby Selling Before the Subcomm. On Children and Youth of the Senate Comm. on Labor and Public Welfare,* 94th Cong.1st Sess. 6 (1975) (Statement of Joseph H. Reid, Executive Director, Child Welfare League of America, Inc.). The situation is ripe for the entry of the middleman who will bring some equilibrium into the market by increasing the supply through the use of money.

Intimated, but disputed, is the assertion that surrogacy will be used for the benefit of the rich at the expense of the poor. *See, e.g.,* Radin, "Market Inalienability," 100 *Harv.L.Rev.* 1849, 1930 (1987). In response it is noted that the Sterns are not rich and the Whiteheads not poor. Nevertheless, it is clear to us

that it is unlikely that surrogate mothers will be as proportionately numerous among those women in the top twenty percent income bracket as among those in the bottom twenty percent. *Ibid.* Put differently, we doubt that infertile couples in the low-income bracket will find upper income surrogates.

In any event, even in this case one should not pretend that disparate wealth does not play a part simply because the contrast is not the dramatic "rich versus poor." At the time of trial, the Whiteheads' net assets were probably negative—Mrs. Whitehead's own sister was foreclosing on a second mortgage. Their income derived from Mr. Whitehead's labors. Mrs. Whitehead is a homemaker, having previously held part-time jobs. The Sterns are both professionals, she a medical doctor, he a biochemist. Their combined income when both were working was about $89,500 a year and their assets sufficient to pay for the surrogacy contract arrangements.

The point is made that Mrs. Whitehead *agreed* to the surrogacy arrangement, supposedly fully understanding the consequences. Putting aside the issue of how compelling her need for money may have been, and how significant her understanding of the consequences, we suggest that her consent is irrelevant. There are, in a civilized society, some things that money cannot buy. In America, we decided long ago that merely because conduct purchased by money was "voluntary" did not mean that it was good or beyond regulation and prohibition. *West Coast Hotel Co. v. Parrish*, 300 *U.S.* 379, 57 *S.Ct.* 578, 81 *L.Ed.* 703 (1937). Employers can no longer buy labor at the lowest price they can bargain for, even though that labor is "voluntary," 29 *U.S.C.* § 206 (1982), or buy women's labor for less money than paid to men for the same job, 29 *U.S.C.* § 206(d), or purchase the agreement of children to perform oppressive labor, 29 *U.S.C.* § 212, or purchase the agreement of workers to subject themselves to unsafe or unhealthful working conditions, 29 *U.S.C.* §§ 651 to 678. (Occupational Safety and Health Act of 1970). There are, in short,

values that society deems more important than granting to wealth whatever it can buy, be it labor, love, or life. Whether this principle recommends prohibition of surrogacy, which presumably sometimes results in great satisfaction to all of the parties, is not for us to say. We note here only that, under existing law, the fact that Mrs. Whitehead "agreed" to the arrangement is not dispositive.

The long-term effects of surrogacy contracts are not known, but feared—the impact on the child who learns her life was bought, that she is the offspring of someone who gave birth to her only to obtain money; the impact on the natural mother as the full weight of her isolation is felt along with the full reality of the sale of her body and her child; the impact on the natural father and adoptive mother once they realize the consequences of their conduct. Literature in related areas suggests these are substantial considerations, although, given the newness of surrogacy, there is little information. *See* N. Baker, *Baby Selling: The Scandal of Black Market Adoption, supra; Adoption and Foster Care, 1975: Hearings on Baby Selling Before the Subcomm. on Children and Youth of the Senate Comm. on Labor and Public Welfare*, 94th Cong. 1st Sess. (1975).

The surrogacy contract is based on, principles that are directly contrary to the objectives of our laws.[10] It guarantees

---

[10]We note the argument of the Sterns that the sperm donor section of our Parentage Act, *N.J.S.A.* 9:17–38 to –59, implies a legislative policy that would lead to approval of this surrogacy contract. Where a married woman is artificially inseminated by another with her husband's consent, the Parentage Act creates a parent-child relationship between the husband and the resulting child. *N.J.S.A.* 9:17–44. The Parentage Act's silence, however, with respect to surrogacy, rather than supporting, defeats any contention that surrogacy should receive treatment parallel to the sperm donor artificial insemination situation. In the latter case the statute expressly transfers parental rights from the biological father, *i.e.*, the sperm donor, to the mother's husband. *Ibid.* Our Legislature could not possibly have intended any other arrangement to have the consequence of transferring parental rights without legislative authorization when it had concluded that legislation was necessary to accomplish that result in the sperm donor artificial insemination context.

the separation of a child from its mother; it looks to adoption regardless of suitability; it totally ignores the child; it takes the child from the mother regardless of her wishes and her maternal fitness; and it does all of this, it accomplishes all of its goals, through the use of money.

Beyond that is the potential degradation of some women that may result from this arrangement. In many cases, of course, surrogacy may bring satisfaction, not only to the infertile couple, but to the surrogate mother herself. The fact, however, that many women may not perceive surrogacy negatively but rather see it as an opportunity does not diminish its potential for devastation to other women.

In sum, the harmful consequences of this surrogacy arrangement appear to us all too palpable. In New Jersey the surrogate mother's agreement to sell her child is void.[11] Its irrevoca-

This sperm donor provision suggests an argument not raised by the parties, namely, that the attempted creation of a parent-child relationship through the surrogacy contract has been preempted by the Legislature. The Legislature has explicitly recognized the parent-child relationship between a child and its natural parents, married and unmarried, *N.J.S.A.* 9:17–38 to –59, between adoptive parents and their adopted child, *N.J.S.A.* 9:3–37 to –56, and between a husband and his wife's child pursuant to the sperm donor provision, *N.J.S.A.* 9:17–44. It has not recognized any others—specifically, it has never legally equated the stepparent-stepchild relationship with the parent-child relationship, and certainly it has never recognized any concept of adoption by contract. It can be contended with some force that the Legislature's statutory coverage of the creation of the parent-child relationship evinces an intent to reserve to itself the power to define what is and is not a parent-child relationship. We need not, and do not, decide this question, however.

[11]Michigan courts have also found that these arrangements conflict with various aspects of their law. *See Doe v. Kelley,* 106 *Mich.App.* 169, 307 *N.W.*2d 438 (1981), *cert.* den., 459 *U.S.* 1183, 103 *S.Ct.* 834, 74 *L.Ed.*2d 1027 (1983) (application of sections of Michigan Adoption Law prohibiting the exchange of money to surrogacy is constitutional); *Syrkowski v. Appleyard,* 122 *Mich.App.* 506, 333 *N.W.*2d 90 (1983) (court held it lacked jurisdiction to issue an "order of filiation" because surrogacy arrangements were not governed by Michigan's Paternity Act), *rev'd,* 420 *Mich.* 367, 362 *N.W.*2d 211 (1985) (court decided Paternity Act should be applied but did not reach the merits of the claim).

Most recently, a Michigan trial court in a matter similar to the case at bar held that surrogacy contracts are void as contrary to public policy and therefore are unenforceable. The court expressed concern for the potential exploitation of children resulting from surrogacy arrangements that involve the payment of money. The court also concluded that insofar as the surrogacy contract may be characterized as one for personal services, the thirteenth amendment should bar specific performance. *Yates v. Keane,* Nos. 9758, 9772, slip op. (Mich.Cir.Ct. Jan. 21, 1988).

The Supreme Court of Kentucky has taken a somewhat different approach to surrogate arrangements. In *Surrogate Parenting Assocs. v. Commonwealth ex. rel. Armstrong,* 704 *S.W.*2d 209 (Ky.1986), the court held that the "fundamental differences" between surrogate arrangements and baby-selling placed the surrogate parenting agreement beyond the reach of Kentucky's baby-selling statute. *Id.* at 211. The rationale for this determination was that unlike the normal adoption situation, the surrogacy agreement is entered into before conception and is not directed at avoiding the consequences of an unwanted pregnancy. *Id.* at 211–12.

Concomitant with this pro-surrogacy conclusion, however, the court held that a "surrogate" mother has the right to void the contract if she changes her mind during pregnancy or immediately after birth. *Id.* at 212–13. The court relied on statutes providing that consent to adoption or to the termination of parental rights prior to five days after the birth of the child is invalid, and concluded that consent before conception must also be unenforceable. *Id.* at 212–13.

The adoption phase of an uncontested surrogacy arrangement was analyzed in *Matter of Adoption of Baby Girl, L.J.,* 132 *Misc.*2d 972, 505 *N.Y.S.*2d 813 (Sur.1986). Although the court expressed strong moral and ethical reservations about surrogacy arrangements, it approved the adoption because it was in the best interests of the child. *Id.* at 815. The court went on to find that surrogate parenting agreements are not void, but are voidable if they are not in accordance with the state's adoption statutes. *Id.* at 817. The court then upheld the payment of money in connection with the surrogacy arrangement on the ground that the New York Legislature did not contemplate surrogacy when the baby-selling statute was passed. *Id.* at 818. Despite the court's ethical and moral problems with surrogate arrangements, it concluded that the Legislature was the appropriate forum to address the legality of surrogacy arrangements. *Ibid.*

In contrast to the law in the United States, the law in the United Kingdom concerning surrogate parenting is fairly well-settled. Parliament passed the Surrogacy Arrangements Act, 1985, ch. 49, which made initiating or taking part in any negotiations with a view to making or arranging a surrogacy contract a criminal offense. The criminal sanction, however, does not apply to the "surrogate" mother or to the natural father, but rather applies to other persons engaged in arranging surrogacy contracts on a commercial basis. Since 1978, English courts have held surrogacy agreements unenforceable as against public policy, such agreements being deemed arrangements for the purchase and sale of children. *A. v. C.,* [1985] *F.L.R.* 445, 449 (Fam. & C.A.1978). It should be

444

bility infects the entire contract, as does the money that purports to buy it.

## III.

## TERMINATION

We have already noted that under our laws termination of parental rights cannot be based on contract, but may be granted only on proof of the statutory requirements. That conclusion was one of the bases for invalidating the surrogacy contract. Although excluding the contract as a basis for parental termination, we did not explicitly deal with the question of whether the statutory bases for termination existed. We do so here.

 As noted before, if termination of Mrs. Whitehead's parental rights is justified, Mrs. Whitehead will have no further claim either to custody or to visitation, and adoption by Mrs. Stern may proceed pursuant to the private placement adoption statute, *N.J.S.A.* 9:3–48. If termination is not justified, Mrs. Whitehead remains the legal mother, and even if not entitled to custody, she would ordinarily be expected to have some rights of visitation. *Wilke v. Culp, supra,* 196 *N.J.Super.* at 496.

As was discussed, *supra* at 425–429, the proper bases for termination are found in the statute relating to proceedings by approved agencies for a termination of parental rights, *N.J.S.A.* 9:2–18, the statute allowing for termination leading to a private placement adoption, *N.J.S.A.* 9:3–48c(1), and the statute authorizing a termination pursuant to an action by DYFS, *N.J.S.A.* 30:4C–20. The statutory descriptions of the conditions required to terminate parental rights differ; their interpretation in case law, however, tends to equate them. *Compare New Jersey*

noted, however, that certain surrogacy arrangements, *i.e.,* those arranged without brokers and revocable by the natural mother, are not prohibited under current law in the United Kingdom.

*Div. of Youth and Family Servs. v. A.W., supra,* 103 *N.J.* at 601–11 (attempted termination by DYFS) *with In re Adoption by J.J.P., supra,* 175 *N.J.Super.* at 426–28 (attempted termination in connection with private placement adoption).

Nothing in this record justifies a finding that would allow a court to terminate Mary Beth Whitehead's parental rights under the statutory standard. It is not simply that obviously there was no "intentional abandonment or very substantial neglect of parental duties without a reasonable expectation of reversal of that conduct in the future," *N.J.S.A.* 9:3–48c(1), quite the contrary, but furthermore that the trial court never found Mrs. Whitehead an unfit mother and indeed affirmatively stated that Mary Beth Whitehead had been a good mother to her other children. 217 *N.J.Super.* at 397.

Although the question of best interests of the child is dispositive of the custody issue in a dispute between natural parents, it does not govern the question of termination. It has long been decided that the mere fact that a child would be better off with one set of parents than with another is an insufficient basis for terminating the natural parent's rights. *See New Jersey Div. of Youth and Family Servs. v. A.W., supra,* 103 *N.J.* at 603; *In re Adoption of Children by D., supra,* 61 *N.J.* at 97–98; *In re Adoption by J.J.P., supra,* 175 *N.J.Super.* at 428. Furthermore, it is equally well settled that surrender of a child and a consent to adoption through private placement do not alone warrant termination. *See Sees v. Baber, supra,* 74 *N.J.* 201. It must be noted, despite some language to the contrary, that the interests of the child are not the only interests involved when termination issues are raised. The parent's rights, both constitutional and statutory, have their own independent vitality. *See New Jersey Div. of Youth and Family Servs. v. A.W., supra,* 103 *N.J.* at 601.

Although the statutes are clear, they are not applied rigidly on all occasions. The statutory standard, strictly construed, appears harsh where the natural parents, having surrendered

their child for adoption through private placement, change their minds and seek the return of their child and where the issue comes before the court with the adoptive parents having had custody for years, and having assumed it quite innocently.

These added dimensions in *Sees v. Baber, supra,* 74 *N.J.* 201, failed to persuade this Court to vary the termination requirements. The natural parent in that case changed her mind two days after surrendering the child, sought his return unequivocally, and so advised the adoptive parents. Since she was clearly fit, and clearly had not abandoned the child in the statutory sense, termination was denied, despite the fact that the adoptive parents had had custody of the child for about a year, and the mother had never had custody at all.

A significant variation on these facts, however, occurred in *Sorentino II, supra,* 74 *N.J.* 313. The surrender there was not through private placement but through an approved agency. Although the consent to surrender was held invalid due to coercion by the agency, the natural parents failed to initiate the lawsuit to reclaim the child for over a year after relinquishment. By the time this Court reached the issue of whether the natural parents' rights could be terminated, the adoptive parents had had custody for three years. These circumstances ultimately persuaded this Court to permit termination of the natural parents' rights and to allow a subsequent adoption. The unique facts of *Sorentino II* were found to amount to a forsaking of parental obligations. *Id.* at 322.

The present case is distinguishable from *Sorentino II.* Mary Beth Whitehead had custody of Baby M for four months before the child was taken away. Her initial surrender of Baby M was pursuant to a contract that we have declared illegal and unenforceable. The Sterns knew almost from the very day that they took Baby M that their rights were being challenged by the natural mother. In short, the factors that persuaded this Court to terminate the parental rights in *Sorentino II* are not found here.

There is simply no basis, either in the statute or in the peculiar facts of that limited class of case typified by *Sorentino II*, to warrant termination of Mrs. Whitehead's parental rights. We therefore conclude that the natural mother is entitled to retain her rights as a mother.

## IV.

## CONSTITUTIONAL ISSUES

Both parties argue that the Constitutions—state and federal—mandate approval of their basic claims. The source of their constitutional arguments is essentially the same: the right of privacy, the right to procreate, the right to the companionship of one's child, those rights flowing either directly from the fourteenth amendment or by its incorporation of the Bill of Rights, or from the ninth amendment, or through the penumbra surrounding all of the Bill of Rights. They are the rights of personal intimacy, of marriage, of sex, of family, of procreation. Whatever their source, it is clear that they are fundamental rights protected by both the federal and state Constitutions. *Lehr v. Robertson*, 463 *U.S.* 248, 103 *S.Ct.* 2985, 77 *L.Ed.*2d 614 (1983); *Santosky v. Kramer*, 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599 (1982); *Zablocki v. Redhail*, 434 *U.S.* 374, 98 *S.Ct.* 673, 54 *L.Ed.*2d 618 (1978); *Quilloin v. Walcott*, 434 *U.S.* 246, 98 *S.Ct.* 549, 54 *L.Ed.*2d 511 (1978); *Carey v. Population Servs. Int'l*, 431 *U.S.* 678, 97 *S.Ct.* 2010, 52 *L.Ed.*2d 675 (1977); *Roe v. Wade*, 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973); *Stanley v. Illinois*, 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.*2d 551 (1972); *Griswold v. Connecticut*, 381 *U.S.* 479, 85 *S.Ct.* 1678, 14 *L.Ed.*2d 510 (1965); *Skinner v. Oklahoma*, 316 *U.S.* 535, 62 *S.Ct.* 1110, 86 *L.Ed.* 1655 (1942); *Meyer v. Nebraska*, 262 *U.S.* 390, 43 *S.Ct.* 625, 67 *L.Ed.* 1042 (1923). The right asserted by the Sterns is the right of procreation; that asserted by Mary Beth Whitehead is the right to the companionship of her child. We find that the right of procreation does not extend as far as claimed by the Sterns. As for the right asserted by Mrs.

Whitehead,[12] since we uphold it on other grounds (*i.e.*, we have restored her as mother and recognized her right, limited by the child's best interests, to her companionship), we need not decide that constitutional issue, and for reasons set forth below, we should not.

The right to procreate, as protected by the Constitution, has been ruled on directly only once by the United States Supreme Court. *See Skinner v. Oklahoma, supra,* 316 *U.S.* 535, 62 *S.Ct.* 1110, 86 *L.Ed.* 1655 (forced sterilization of habitual criminals violates equal protection clause of fourteenth amendment). Although *Griswold v. Connecticut, supra,* 381 *U.S.* 479, 85 *S.Ct.* 1678, 14 *L.Ed.*2d 510, is obviously of a similar class, strictly speaking it involves the right *not* to procreate. The right to procreate very simply is the right to have natural children, whether through sexual intercourse or artificial insemination. It is no more than that. Mr. Stern has not been deprived of that right. Through artificial insemination of Mrs. Whitehead, Baby M is his child. The custody, care, companionship, and nurturing that follow birth are not parts of the right to procreation; they are rights that may also be constitutionally protected, but that involve many considerations other than the right of procreation. To assert that Mr. Stern's right of procreation gives him the right to the custody of Baby M would be to assert that Mrs. Whitehead's right of procreation does *not* give her the right to the custody of Baby M; it would be to assert that the constitutional right of procreation includes within it a constitutionally protected contractual right to destroy someone else's right of procreation.

We conclude that the right of procreation is best understood and protected if confined to its essentials, and that when dealing with rights concerning the resulting child, different

---

[12]Opponents of surrogacy have also put forth arguments based on the thirteenth amendment, as well as the Peonage Act, 42 *U.S.C.* § 1994 (1982). We need not address these arguments because we have already held the contract unenforceable on the basis of state law.

interests come into play. There is nothing in our culture or society that even begins to suggest a fundamental right on the part of the father to the custody of the child as part of his right to procreate when opposed by the claim of the mother to the same child. We therefore disagree with the trial court: there is no constitutional basis whatsoever requiring that Mr. Stern's claim to the custody of Baby M be sustained. Our conclusion may thus be understood as illustrating that a person's rights of privacy and self-determination are qualified by the effect on innocent third persons of the exercise of those rights.[13]

Mr. Stern also contends that he has been denied equal protection of the laws by the State's statute granting full

---

[13]As a general rule, a person should be accorded the right to make decisions affecting his or her own body, health, and life, unless that choice adversely affects others. Thus, the United States Supreme Court, while recognizing the right of women to control their own bodies, has rejected the view that the federal constitution vests a pregnant woman with an absolute right to terminate her pregnancy. Instead, the Court declared that the right was "not absolute" so that "at some point the state interests as to protection of health, medical standards, and prenatal life, become dominant." *Roe v. Wade, supra,* 410 *U.S.* at 155, 93 *S.Ct.* at 728, 35 *L.Ed.*2d at 178. The balance struck in *Roe v. Wade* recognizes increasing rights in the fetus and correlative restrictions on the mother as the pregnancy progresses. Similarly, in the termination-of-treatment cases, courts generally have viewed a patient's right to terminate or refuse life-sustaining treatment as constrained by other considerations including the rights of innocent third parties, such as the patient's children. *Matter of Farrell,* 108 *N.J.* 335, 352 (1987); *Matter of Conroy,* 98 *N.J.* 321, 353 (1985). Consistent with that approach, this Court has directed a mother to submit to a life-saving blood transfusion to protect the interests of her unborn infant, even though the mother's religious scruples led her to oppose the transfusion. *Raleigh-Fitkin Paul Morgan Hosp. v. Anderson,* 42 *N.J.* 421, 423 (1964); *see also Application of President & Directors of Georgetown College,* 331 *F.*2d 1000, 1008 (D.C.Cir.), *cert.* den., 377 *U.S.* 978, 84 *S.Ct.* 1883, 12 *L.Ed.*2d 746 (1964) (ordering blood transfusion because of mother's "responsibility to the community to care for her infant").

In the present case, the parties' right to procreate by methods of their own choosing cannot be enforced without consideration of the state's interest in protecting the resulting child, just as the right to the companionship of one's child cannot be enforced without consideration of that crucial state interest.

parental rights to a husband in relation to the child produced, with his consent, by the union of his wife with a sperm donor. *N.J.S.A.* 9:17–44. The claim really is that of Mrs. Stern. It is that she is in precisely the same position as the husband in the statute: she is presumably infertile, as is the husband in the statute; her spouse by agreement with a third party procreates with the understanding that the child will be the couple's child. The alleged unequal protection is that the understanding is honored in the statute when the husband is the infertile party, but no similar understanding is honored when it is the wife who is infertile.

It is quite obvious that the situations are not parallel. A sperm donor simply cannot be equated with a surrogate mother. The State has more than a sufficient basis to distinguish the two situations—even if the only difference is between the time it takes to provide sperm for artificial insemination and the time invested in a nine-month pregnancy—so as to justify automatically divesting the sperm donor of his parental rights without automatically divesting a surrogate mother. Some basis for an equal protection argument might exist if Mary Beth Whitehead had contributed her egg to be implanted, fertilized or otherwise, in Mrs. Stern, resulting in the latter's pregnancy. That is not the case here, however.

Mrs. Whitehead, on the other hand, asserts a claim that falls within the scope of a recognized fundamental interest protected by the Constitution. As a mother, she claims the right to the companionship of her child. This is a fundamental interest, constitutionally protected. Furthermore, it was taken away from her by the action of the court below. Whether that action under these circumstances would constitute a constitutional deprivation, however, we need not and do not decide. By virtue of our decision Mrs. Whitehead's constitutional complaint—that her parental rights have been unconstitutionally terminated—is moot. We have decided that both the statutes and public policy of this state require that that termination be

voided and that her parental rights be restored. It therefore becomes unnecessary to decide whether that same result would be required by virtue of the federal or state Constitutions. *See Ashwander v. Tennessee Valley Auth.*, 297 *U.S.* 288, 341, 346–48, 56 *S.Ct.* 466, 482–83, 80 *L.Ed.* 688, 707, 710–12 (1936) (Brandeis, J., concurring). Refraining from deciding such constitutional issues avoids further complexities involving the full extent of a parent's right of companionship,[14] or questions involving the fourteenth amendment.[15]

Having held the contract invalid and having found no other grounds for the termination of Mrs. Whitehead's parental rights, we find that nothing remains of her constitutional claim. It seems obvious to us that since custody and visitation encompass practically all of what we call "parental rights," a total denial of both would be the equivalent of termination of parental rights. *Franz v. United States*, 707 *F.*2d 582, 602 (D.C.Cir. 1983). That, however, as will be seen below, has not occurred here. We express no opinion on whether a prolonged suspension of visitation would constitute a termination of parental rights, or whether, assuming it would, a showing of unfitness

---

[14]This fundamental right is not absolute. The parent-child biological relationship, by itself, does not create a protected interest in the absence of a demonstrated commitment to the responsibilities of parenthood; a natural parent who does not come forward and seek a role in the child's life has no constitutionally protected relationship. *Lehr v. Robertson, supra,* 463 *U.S.* at 258–62, 103 *S.Ct.* at 2991–93, 77 *L.Ed.*2d at 624–27; *Quilloin v. Walcott, supra,* 434 *U.S.* at 254–55, 98 *S.Ct.* at 554, 54 *L.Ed.*2d at 519–20. The right is not absolute in another sense, for it is also well settled that if the state's interest is sufficient the right may be regulated, restricted, and on occasion terminated. *See Santosky v. Kramer, supra,* 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599.

[15]Were we to find such a constitutional determination necessary, we would be faced with the question of whether it was state action—essential in triggering the fourteenth amendment—that deprived her of that right *i.e.,* whether the judicial decision enforcing the surrogacy contract should be considered "state action" within the scope of the fourteenth amendment. *See Shelley v. Kraemer,* 334 *U.S.* 1, 68 *S.Ct.* 836, 92 *L.Ed.* 1161 (1948); Cherminsky, "Rethinking State Action," 80 *Nw.U.L.Rev.* 503 (1985).

would be required.[16]

# V.

## CUSTODY

Having decided that the surrogacy contract is illegal and unenforceable, we now must decide the custody question without regard to the provisions of the surrogacy contract that would give Mr. Stern sole and permanent custody. (That does not mean that the existence of the contract and the circumstances under which it was entered may not be considered to

---

[16]If the Legislature were to enact a statute providing for enforcement of surrogacy agreements, the validity of such a statute might depend on the strength of the state interest in making it more likely that infertile couples will be able to adopt children. As a value, it is obvious that the interest is strong; but if, as plaintiffs assert, ten to fifteen percent of all couples are infertile, the interest is of enormous strength. This figure is given both by counsel for the Sterns and by the trial court, 217 *N.J.Super.* at 331. We have been unable to find reliable confirmation of this statistic, however, and we are not confident of its accuracy. We note that at least one source asserts that in 1982, the rate of married couples who were both childless and infertile was only 5.8%. B. Wattenberg, The Birth Dearth 125 (1987).

On such quantitative differences, constitutional validity can depend, where the statute in question is justified as serving a compelling state interest. The quality of the interference with the parents' right of companionship bears on these issues: if a statute, like the surrogacy contract before us, made the consent given prior to conception irrevocable, it might be regarded as a greater interference with the fundamental right than a statute that gave that effect only to a consent executed, for instance, more than six months after the child's birth. There is an entire spectrum of circumstances that strengthen and weaken the fundamental right involved, and a similar spectrum of state interests that justify or do not justify particular restrictions on that right. We do not believe it would be wise for this Court to attempt to identify various combinations of circumstances and interests, and attempt to indicate which combinations might and which might not constitutionally permit termination of parental rights.

We will say this much, however: a parent's fundamental right to the companionship of one's child can be significantly eroded by that parent's consent to the surrender of that child. That surrender, if voluntarily and knowingly made, may reduce the strength of that fundamental right to the

the extent deemed relevant to the child's best interests.) With the surrogacy contract disposed of, the legal framework becomes a dispute between two couples over the custody of a child produced by the artificial insemination of one couple's wife by the other's husband. Under the Parentage Act the claims of the natural father and the natural mother are entitled to equal weight, *i.e.*, one is not preferred over the other solely because he or she is the father or the mother. *N.J.S.A.* 9:17–40.[17] The applicable rule given these circumstances is clear: the child's best interests determine custody.

---

point where a statute awarding custody and all parental rights to an adoptive couple, especially one that includes a parent of the child, would be valid.

[17]At common law the rights of women were so fragile that the husband generally had the paramount right to the custody of children upon separation or divorce. *State v. Baird,* 21 *N.J.Eq.* 384, 388 (E. & A. 1869). In 1860 a statute concerning separation provided that children "within the age of seven years" be placed with the mother "unless said mother shall be of such character and habits as to render her an improper guardian." *L.*1860, *c.* 167. The inequities of the common-law rule and the 1860 statute were redressed by an 1871 statute, providing that "the rights of both parents, in the absence of misconduct, shall be held to be equal." *L.*1871, *c.* 48, § 6 (currently codified at *N.J.S.A.* 9:2–4). Under this statute the father's superior right to the children was abolished and the mother's right to custody of children of tender years was also eliminated. Under the 1871 statute, "the happiness and welfare of the children" were to determine custody, *L.*1871, *c.* 48, § 6, a rule that remains law to this day. *N.J.S.A.* 9:2–4.

Despite this statute, however, the "tender years" doctrine persisted. *See, e.g., Esposito v. Esposito,* 41 *N.J.* 143, 145 (1963); *Dixon v. Dixon,* 71 *N.J.Eq.* 281, 282 (E. & A.1906); *M.P. v. S.P.,* 169 *N.J.Super.* 425, 435 (App.Div.1979). This presumption persisted primarily because of the prevailing view that a young child's best interests necessitated a mother's care. Both the development of case law and the Parentage Act, *N.J.S.A.* 9:17–40, however, provide for equality in custody claims. In *Beck v. Beck,* 86 *N.J.* 480, 488 (1981), we stated that it would be inappropriate "to establish a presumption ... in favor of any particular custody determination," as any such presumption may "serve as a disincentive for the meticulous fact-finding required in custody cases." This does not mean that a mother who has had custody of her child for three, four, or five months does not have a particularly strong claim arising out of the unquestionable bond that exists at that point between the child and its mother; in other words, equality does not mean that all of the considerations underlying the "tender years" doctrine have been abolished.

We note again that the trial court's reasons for determining what were the child's best interests were somewhat different from ours. It concluded that the surrogacy contract was valid, but that it could not grant specific performance unless to do so was in the child's best interests. The approach was that of a Chancery judge, unwilling to give extraordinary remedies unless they well served the most important interests, in this case, the interests of the child. While substantively indistinguishable from our approach to the question of best interests, the purpose of the inquiry was not the usual purpose of determining custody, but of determining a contractual remedy.

We are not concerned at this point with the question of termination of parental rights, either those of Mrs. Whitehead or of Mr. Stern. As noted in various places in this opinion, such termination, in the absence of abandonment or a valid surrender, generally depends on a showing that the particular parent is unfit. The question of custody in this case, as in practically all cases, assumes the fitness of both parents, and no serious contention is made in this case that either is unfit. The issue here is which life would be *better* for Baby M, one with primary custody in the Whiteheads or one with primary custody in the Sterns.

The circumstances of this custody dispute are unusual and they have provoked some unusual contentions. The Whiteheads claim that even if the child's best interests would be served by our awarding custody to the Sterns, we should not do so, since that will encourage surrogacy contracts—contracts claimed by the Whiteheads, and we agree, to be violative of important legislatively-stated public policies. Their position is that in order that surrogacy contracts be deterred, custody should remain in the surrogate mother unless she is unfit, regardless of the best interests of the child. We disagree. Our declaration that this surrogacy contract is unenforceable and illegal is sufficient to deter similar agreements. We need not sacrifice the child's interests in order to make that point sharp-

er. *Cf. In re Adoption of Child by I.T. and K.T.*, 164 *N.J.Super.* 476, 484–86 (App.Div.1978) (adoptive parents' participation in illegal placement does not mandate denial of adoption); *In the Matter of the Adoption of Child by N.P. and F.P.*, 165 *N.J.Super.* 591 (Law Div.1979) (use of unapproved intermediaries and the payment of money in connection with adoption is insufficient to establish that the would-be adoptive parents are unfit or that adoption would not be in child's best interests).

 The Whiteheads also contend that the award of custody to the Sterns *pendente lite* was erroneous and that the error should not be allowed to affect the final custody decision. As noted above, at the very commencement of this action the court issued an *ex parte* order requiring Mrs. Whitehead to turn over the baby to the Sterns; Mrs. Whitehead did not comply but rather took the child to Florida. Thereafter, a similar order was enforced by the Florida authorities resulting in the transfer of possession of Baby M to the Sterns. The Sterns retained custody of the child throughout the litigation. The Whiteheads' point, assuming the *pendente* award of custody *was* erroneous, is that most of the factors arguing for awarding permanent custody to the Sterns resulted from that initial *pendente lite* order. Some of Mrs. Whitehead's alleged character failings, as testified to by experts and concurred in by the trial court, were demonstrated by her actions brought on by the custody crisis. For instance, in order to demonstrate her impulsiveness, those experts stressed the Whiteheads' flight to Florida with Baby M; to show her willingness to use her children for her own aims, they noted the telephone threats to kill Baby M and to accuse Mr. Stern of sexual abuse of her daughter; in order to show Mrs. Whitehead's manipulativeness, they pointed to her threat to kill herself; and in order to show her unsettled family life, they noted the innumerable moves from one hotel or motel to another in Florida. Furthermore, the argument continues, one of the most important factors, whether mentioned or not, in favor of custody in the Sterns is their continuing custody during the litigation, now having lasted for one-and-a-half

years. The Whiteheads' conclusion is that had the trial court not given initial custody to the Sterns during the litigation, Mrs. Whitehead not only would have demonstrated her perfectly acceptable personality—the general tenor of the opinion of experts was that her personality problems surfaced primarily in crises—but would also have been able to prove better her parental skills along with an even stronger bond than may now exist between her and Baby M. Had she not been limited to custody for four months, she could have proved all of these things much more persuasively through almost two years of custody.

The argument has considerable force. It is of course possible that the trial court was wrong in its initial award of custody. It is also possible that such error, if that is what it was, may have affected the outcome. We disagree with the premise, however, that in determining custody a court should decide what the child's best interests *would be* if some hypothetical state of facts had existed. Rather, we must look to what those best interests *are, today,* even if some of the facts may have resulted in part from legal error. The child's interests come first: we will not punish it for judicial errors, assuming any were made. *See Wist v. Wist,* 101 *N.J.* 509, 513–14 (1986); *see also In re J.R. Guardianship,* 174 *N.J.Super.* 211 (App.Div.), certif. den., 85 *N.J.* 102 (1980) (although not explicitly mentioned, natural mother's loss of parental rights based substantially on failures of DYFS to arrange visitation with her child). The custody decision must be based on all circumstances, on everything that *actually* has occurred, on everything that is relevant to the child's best interests. Those circumstances include the trip to Florida, the telephone calls and threats, the substantial period of successful custody with the Sterns, and all other relevant circumstances. We will discuss the question of the correctness of the trial court's initial orders below, but for purposes of determining Baby M's best interests, the correctness of those initial orders has lost relevance.

■ There were eleven experts who testified concerning the child's best interests, either directly or in connection with matters related to that issue. Our reading of the record persuades us that the trial court's decision awarding custody to the Sterns (technically to Mr. Stern) should be affirmed since "its findings ... could reasonably have been reached on sufficient credible evidence present in the record." *Beck v. Beck*, 86 *N.J.* 480, 496 (1981) (quoting *State v. Johnson*, 42 *N.J.* 146, 161 (1964)); *see Palermo v. Palermo*, 164 *N.J.Super.* 492, 498 (App.Div.1978) (noting that family court judge was experienced in dealing with such matters and had opportunity to observe parties and become immersed in details of case). More than that, on this record we find little room for any different conclusion. The trial court's treatment of this issue, 217 *N.J. Super.* at 391–400, is both comprehensive and, in most respects, perceptive. We agree substantially with its analysis with but few exceptions that, although important, do not change our ultimate views.

Our custody conclusion is based on strongly persuasive testimony contrasting both the family life of the Whiteheads and the Sterns and the personalities and characters of the individuals. The stability of the Whitehead family life was doubtful at the time of trial. Their finances were in serious trouble (foreclosure by Mrs. Whitehead's sister on a second mortgage was in process). Mr. Whitehead's employment, though relatively steady, was always at risk because of his alcoholism, a condition that he seems not to have been able to confront effectively. Mrs. Whitehead had not worked for quite some time, her last two employments having been part-time. One of the Whiteheads' positive attributes was their ability to bring up two children, and apparently well, even in so vulnerable a household. Yet substantial question was raised even about that aspect of their home life. The expert testimony contained criticism of Mrs. Whitehead's handling of her son's educational difficulties. Certain of the experts noted that Mrs. Whitehead perceived herself as omnipotent and omniscient concerning her

children. She knew what they were thinking, what they wanted, and she spoke for them. As to Melissa, Mrs. Whitehead expressed the view that she alone knew what that child's cries and sounds meant. Her inconsistent stories about various things engendered grave doubts about her ability to explain honestly and sensitively to Baby M—and at the right time—the nature of her origin. Although faith in professional counseling is not a *sine qua non* of parenting, several experts believed that Mrs. Whitehead's contempt for professional help, especially professional psychological help, coincided with her feelings of omnipotence in a way that could be devastating to a child who most likely will need such help. In short, while love and affection there would be, Baby M's life with the Whiteheads promised to be too closely controlled by Mrs. Whitehead. The prospects for wholesome, independent psychological growth and development would be at serious risk.

The Sterns have no other children, but all indications are that their household and their personalities promise a much more likely foundation for Melissa to grow and thrive. There *is* a track record of sorts—during the one-and-a-half years of custody Baby M has done very well, and the relationship between both Mr. and Mrs. Stern and the baby has become very strong. The household is stable, and likely to remain so. Their finances are more than adequate, their circle of friends supportive, and their marriage happy. Most important, they are loving, giving, nurturing, and open-minded people. They have demonstrated the wish and ability to nurture and protect Melissa, yet at the same time to encourage her independence. Their lack of experience is more than made up for by a willingness to learn and to listen, a willingness that is enhanced by their professional training, especially Mrs. Stern's experience as a pediatrician. They are honest; they can recognize error, deal with it, and learn from it. They will try to determine rationally the best way to cope with problems in their relationship with Melissa. When the time comes to tell her about her origins, they will probably have found a means of doing so that accords with the

best interests of Baby M. All in all, Melissa's future appears solid, happy, and promising with them.

Based on all of this we have concluded, independent of the trial court's identical conclusion, that Melissa's best interests call for custody in the Sterns. Our above-mentioned disagreements with the trial court do not, as we have noted, in any way diminish our concurrence with its conclusions. We feel, however, that those disagreements are important enough to be stated. They are disagreements about the evaluation of conduct. They also may provide some insight about the potential consequences of surrogacy.

It seems to us that given her predicament, Mrs. Whitehead was rather harshly judged—both by the trial court and by some of the experts. She was guilty of a breach of contract, and indeed, she did break a very important promise, but we think it is expecting something well beyond normal human capabilities to suggest that this mother should have parted with her newly born infant without a struggle. Other than survival, what stronger force is there? We do not know of, and cannot conceive of, any other case where a perfectly fit mother was expected to surrender her newly born infant, perhaps forever, and was then told she was a bad mother because she did not. We know of no authority suggesting that the moral quality of her act in those circumstances should be judged by referring to a contract made before she became pregnant. We do not countenance, and would never countenance, violating a court order as Mrs. Whitehead did, even a court order that is wrong; but her resistance to an order that she surrender her infant, possibly forever, merits a measure of understanding. We do not find it so clear that her efforts to keep her infant, when measured against the Sterns' efforts to take her away, make one, rather than the other, the wrongdoer. The Sterns suffered, but so did she. And if we go beyond suffering to an ✓ evaluation of the human stakes involved in the struggle, how much weight should be given to her nine months of pregnancy, the labor of childbirth, the risk to her life, compared to the

payment of money, the anticipation of a child and the donation of sperm?

There has emerged a portrait of Mrs. Whitehead, exposing her children to the media, engaging in negotiations to sell a book, granting interviews that seemed helpful to her, whether hurtful to Baby M or not, that suggests a selfish, grasping woman ready to sacrifice the interests of Baby M and her other children for fame and wealth. That portrait is a half-truth, for while it may accurately reflect what ultimately occurred, its implication, that this is what Mary Beth Whitehead wanted, is totally inaccurate, at least insofar as the record before us is concerned. There is not one word in that record to support a claim that had she been allowed to continue her possession of her newly born infant, Mrs. Whitehead would have ever been heard of again; not one word in the record suggests that her change of mind and her subsequent fight for her child was motivated by anything other than love—whatever complex underlying psychological motivations may have existed.

We have a further concern regarding the trial court's emphasis on the Sterns' interest in Melissa's education as compared to the Whiteheads'. That this difference is a legitimate factor to be considered we have no doubt. But it should not be overlooked that a best-interests test is designed to create not a new member of the intelligentsia but rather a well-integrated person who might reasonably be expected to be happy with life. "Best interests" does not contain within it any idealized lifestyle; the question boils down to a judgment, consisting of many factors, about the likely future happiness of a human being. *Fantony v. Fantony, supra,* 21 *N.J.* at 536. Stability, love, family happiness, tolerance, and, ultimately, support of independence—all rank much higher in predicting future happiness than the likelihood of a college education. We do not mean to suggest that the trial court would disagree. We simply want to dispel any possible misunderstanding on the issue.

Even allowing for these differences, the facts, the experts' opinions, and the trial court's analysis of both argue strongly in favor of custody in the Sterns. Mary Beth Whitehead's family life, into which Baby M would be placed, was anything but secure—the quality Melissa needs most. And today it may be even less so.[18] Furthermore, the evidence and expert opinion based on it reveal personality characteristics, mentioned above, that might threaten the child's best development. The Sterns promise a secure home, with an understanding relationship that allows nurturing and independent growth to develop together. Although there is no substitute for reading the entire record, including the review of every word of each experts' testimony and reports, a summary of their conclusions is revealing. Six experts testified for Mrs. Whitehead: one favored joint custody, clearly unwarranted in this case; one simply rebutted an opposing expert's claim that Mary Beth Whitehead had a recognized personality disorder; one testified to the adverse impact of separation on *Mrs. Whitehead;* one testified about the evils of adoption and, to him, the probable analogous evils of surrogacy; one spoke only on the question of whether Mrs. Whitehead's consent in the surrogacy agreement was "informed consent"; and one spelled out the strong bond between mother and child. None of them unequivocally stated, or even necessarily implied, an opinion that custody in the Whiteheads was in the best interests of Melissa—the ultimate issue. The Sterns' experts,

[18]Subsequent to trial, and by the time of oral argument, Mr. and Mrs. Whitehead had separated, and the representation was that there was no likelihood of change. Thereafter Mrs. Whitehead became pregnant by another man, divorced Mr. Whitehead, and remarried the other man. Both children are living with Mrs. Whitehead and her new husband. Both the former and present husband continue to assert the desire to have whatever parental relationship with Melissa that the law allows, Mrs. Whitehead continuing to maintain her claim for custody.

We refer to this development only because it suggests less stability in the Whiteheads' lives. It does not necessarily suggest that Mrs. Whitehead's conduct renders her any less a fit parent. In any event, this new development has not affected our decision.

both well qualified—as were the Whiteheads'—concluded that the best interests of Melissa required custody in Mr. Stern. Most convincingly, the three experts chosen by the court-appointed guardian *ad litem* of Baby M, each clearly free of all bias and interest, unanimously and persuasively recommended custody in the Sterns.

Some comment is required on the initial *ex parte* order awarding custody *pendente lite* to the Sterns (and the continuation of that order after a plenary hearing). The issue, although irrelevant to our disposition of this case, may recur; and when it does, it can be of crucial importance. When father and mother are separated and disagree, at birth, on custody, only in an extreme, truly rare, case should the child be taken from its mother *pendente lite, i.e.*, only in the most unusual case should the child be taken from its mother before the dispute is finally determined by the court on its merits. The probable bond between mother and child, and the child's need, not just the mother's, to strengthen that bond, along with the likelihood, in most cases, of a significantly lesser, if any, bond with the father—all counsel against temporary custody in the father. A substantial showing that the mother's continued custody would threaten the child's health or welfare would seem to be required.

In this case, the trial court, believing that the surrogacy contract might be valid, and faced with the probable flight from the jurisdiction by Mrs. Whitehead and the baby if *any* notice were served, ordered, *ex parte*, an immediate transfer of possession of the child, *i.e.*, it ordered that custody be transferred immediately to Mr. Stern, rather than order Mrs. Whitehead not to leave the State. We have ruled, however, that the surrogacy contract is unenforceable and illegal. It provides no basis for either an *ex parte*, a plenary, an interlocutory, or a final order requiring a mother to surrender custody to a father. Any application by the natural father in a surrogacy dispute for custody pending the outcome of the litigation will henceforth

require proof of unfitness, of danger to the child, or the like, of so high a quality and persuasiveness as to make it unlikely that such application will succeed. Absent the required showing, all that a court should do is list the matter for argument on notice to the mother. Even her threats to flee should not suffice to warrant any other relief unless her unfitness is clearly shown. At most, it should result in an order enjoining such flight. The erroneous transfer of custody, as we view it, represents a greater risk to the child than removal to a foreign jurisdiction, unless parental unfitness is clearly proved. Furthermore, we deem it likely that, advised of the law and knowing that her custody cannot seriously be challenged at this stage of the litigation, surrogate mothers will obey any court order to remain in the jurisdiction.

## VI.

### VISITATION

The trial court's decision to terminate Mrs. Whitehead's parental rights precluded it from making any determination on visitation. 217 *N.J.Super.* at 399, 408. Our reversal of the trial court's order, however, requires delineation of Mrs. Whitehead's rights to visitation. It is apparent to us that this factually sensitive issue, which was never addressed below, should not be determined *de novo* by this Court. We therefore remand the visitation issue to the trial court for an abbreviated hearing and determination as set forth below.[19]

---

[19]As we have done in similar situations, we order that this matter be referred on remand to a different trial judge by the vicinage assignment judge. The original trial judge's potential "commitment to its findings," *New Jersey Div. of Youth & Family Servs. v. A.W., supra,* 103 *N.J.* at 617, and the extent to which a judge "has already engaged in weighing the evidence," *In re Guardianship of R.,* 155 *N.J.Super.* 186, 195 (App.Div.1977), persuade us to make that change. On remand the trial court will consider developments subsequent to the original trial court's opinion, including Mrs. Whitehead's divorce, pregnancy, and remarriage.

For the benefit of all concerned, especially the child, we would prefer to end these proceedings now, once and for all. It is clear to us, however, that it would be unjust to do so and contrary to precedent.

The fact that the trial court did not address visitation is only one reason for remand. The ultimate question is whether, despite the absence of the trial court's guidance, the record before us is sufficient to allow an appellate court to make this essentially factual determination. We can think of no issue that is more dependent on a trial court's factual findings and evaluation than visitation.

When we examine the record on visitation, the only testimony explicitly dealing with the issue came from the guardian *ad litem*'s experts. Examination of this testimony in light of the complete record, however, reveals that it was an insignificant part of their opinions. The parties, those with a real stake in the dispute, offered no testimony on the issue. The cause for this insufficiency of guidance on the visitation issue was unquestionably the parties' concentration on other, then seemingly much more important, questions: custody, termination of parental rights, and the validity of the surrogacy contract.

Even if we were willing to rely solely on the opinions of the guardian *ad litem*'s experts, their testimony was not fully developed because the issue was not the focus of the litigation. Moreover, the guardian's experts concentrated on determining "best interests" as it related to custody and to termination of parental rights. Their observations about visitation, both in quality and quantity, were really derivative of their views about custody and termination. The guardian's experts were concerned that given Mrs. Whitehead's determination to have custody, visitation might be used to undermine the Sterns' parental authority and thereby jeopardize the stability and security so badly needed by this child. Two of the experts recommended suspension of visitation for five years and the other suspension for an undefined period. None of them fully considered the

factors that have led our courts ordinarily to grant visitation in other contexts, with no suspension, even where the non-custodial parent was less than a paragon of virtue. *See, e.g., Wilke v. Culp, supra,* 196 *N.J.Super.* at 496; *In re Adoption by J.J.P., supra,* 175 *N.J.Super.* at 430. Based on the opinions of her experts, the guardian *ad litem* recommended suspension of Mrs. Whitehead's visitation rights for five years, with a reevaluation at that time. The basis for that recommendation, whether one regards it as the right or the wrong conclusion, was apparently bolstered when it was learned that Mrs. Whitehead had become pregnant, divorced Richard Whitehead, and then married the father of her new child-to-be. Without any further expert testimony, the guardian *ad litem* revised her position. She now argues that instead of five years, visitation should be suspended until Melissa reaches majority. This radical change in the guardian *ad litem*'s position reinforces our belief that further consideration must be given to this issue.

The foregoing does not fully describe the extent to which this record leaves us uninformed on the visitation issue. No one, with one exception, included a word about visitation in the final briefs before the trial court. The exception was Mrs. Whitehead's parents who argued for their own visitation. This claim was denied by the trial court and is not now before us. The oral summations of counsel before the trial court were almost equally bereft of even a reference to the visitation issue. Mrs. Whitehead's counsel did not mention visitation. The Sterns' counsel referred to the guardian *ad litem*'s expert testimony about visitation, not to argue for or against visitation but only to support his argument in favor of termination of Mrs. Whitehead's parental rights. The guardian *ad litem* did argue the visitation issue, devoting a minimal portion of her summation to it. Only the grandparents dealt with visitation, but with their visitation, not with the issue of Mrs. Whitehead's visitation. Finally, on appeal before this Court the record on visitation is inadequate—especially when compared to the treatment of other issues.

We join those who want this litigation to end for the benefit of this child. To spare this two-year-old another sixty to ninety days of litigation, however, at the risk of wrongly deciding this matter, which has life-long consequences for the child and the parties, would be unwise.

We also note the following for the trial court's consideration: First, this is not a divorce case where visitation is almost invariably granted to the non-custodial spouse. To some extent the facts here resemble cases where the non-custodial spouse has had practically no relationship with the child, see *Wilke v. Culp, supra,* 196 *N.J.Super.* 487; but it only "resembles" those cases. In the instant case, Mrs. Whitehead spent the first four months of this child's life as her mother and has regularly visited the child since then. Second, she is not only the natural mother, but also the legal mother, and is not to be penalized one iota because of the surrogacy contract. Mrs. Whitehead, as the mother (indeed, as a mother who nurtured her child for its first four months—unquestionably a relevant consideration), is entitled to have her own interest in visitation considered. Visitation cannot be determined without considering the parents' interests along with those of the child.

In all of this, the trial court should recall the touchstones of visitation: that it is desirable for the child to have contact with both parents; that besides the child's interests, the parents' interests also must be considered; but that when all is said and done, the best interests of the child are paramount.

We have decided that Mrs. Whitehead is entitled to visitation at some point, and that question is not open to the trial court on this remand. The trial court will determine what kind of visitation shall be granted to her, with or without conditions, and when and under what circumstances it should commence. It also should be noted that the guardian's recommendation of a five-year delay is most unusual—one might argue that it begins to border on termination. Nevertheless, if the circumstances as further developed by appropriate proofs

or as reconsidered on remand clearly call for that suspension under applicable legal principles of visitation, it should be so ordered.

In order that the matter be determined as expeditiously as possible, we grant to the trial court the broadest powers to reach its determination. A decision shall be rendered in no more than ninety days from the date of this opinion.

The trial court shall, after reviewing the transcripts and other material, determine in its discretion whether further evidence is needed and through what witnesses it shall be presented. The trial court should consider limiting the witnesses to the experts who testified and to Mr. and Mrs. Stern and Mr. and Mrs. Whitehead, using its own judgment in deciding which of them, if any, shall be called on to give further evidence. The trial court, in its discretion, may either hear testimony or receive verified written submissions, relaxing the Rules of Evidence to the extent compatible with reliable fact-finding and desirable for an expeditious decision.[20] Many significant facts bearing on visitation have already been adduced. Although additional evidence may be important, we believe that fairness does not necessarily require that it be produced with all of the procedural safeguards implicit in the Evidence Rules. When it comes to custody matters, application of rules, including those concerning evidence, must on some occasions be flexible, *New Jersey Div. of Youth & Family Servs. v. S.S.*, 185 *N.J.Super.* 3 (App.Div.), certif. den., 91 *N.J.* 572 (1982), especially in view of the child's interests in this unique situation.

---

[20]Ordinarily relaxation of the Rules of Evidence depends on specific authority, either within the Rules or in statutes. *See* N.J.Rules of Evidence, Comment 2 to Evid.R. 2(2), 72–76 (1987). There are numerous examples, however, of relaxation of these Rules in judicial proceedings for reasons peculiar to the case at hand. We regard the circumstances of the visitation aspect of this case as most unusual. In addition to the ordinary risks to the stability of an infant caused by prolonging this type of litigation, here there are risks from publicity that we simply cannot quantify. We have no doubt that these circumstances justify any sensible means of abbreviating the remand hearing.

Any party wishing to appeal from the trial court's judgment on visitation shall file a notice of appeal within ten days thereafter, the Court hereby reducing the ordinary time to appeal pursuant to *Rule* 2:12–2. Any such appeal is hereby certified to this Court.

Any further proceedings in this matter, or related thereto, if made by application to the trial court shall be made to the judge to whom the matter is assigned on remand. That direction applies to applications related to this matter in any way: whether made before, during, or after proceedings on remand, and regardless of the nature of the application. Any applications for appellate review shall be made directly to this Court.

We would expect that after the visitation issue is determined the trial court, in connection with any other applications in the future, will attempt to assure that this case is treated like any other so that this child may be spared any further damaging publicity.

While probably unlikely, we do not deem it unthinkable that, the major issues having been resolved, the parties' undoubted love for this child might result in a good faith attempt to work out the visitation themselves, in the best interests of their child.

## CONCLUSION

This case affords some insight into a new reproductive arrangement: the artificial insemination of a surrogate mother. The unfortunate events that have unfolded illustrate that its unregulated use can bring suffering to all involved. Potential victims include the surrogate mother and her family, the natural father and his wife, and most importantly, the child. Although surrogacy has apparently provided positive results for some infertile couples, it can also, as this case demonstrates, cause suffering to participants, here essentially innocent and well-intended.

We have found that our present laws do not permit the surrogacy contract used in this case. Nowhere, however, do

we find any legal prohibition against surrogacy when the surrogate mother volunteers, without any payment, to act as a surrogate and is given the right to change her mind and to assert her parental rights. Moreover, the Legislature remains free to deal with this most sensitive issue as it sees fit, subject only to constitutional constraints.

If the Legislature decides to address surrogacy, consideration of this case will highlight many of its potential harms. We do not underestimate the difficulties of legislating on this subject. In addition to the inevitable confrontation with the ethical and moral issues involved, there is the question of the wisdom and effectiveness of regulating a matter so private, yet of such public interest. Legislative consideration of surrogacy may also provide the opportunity to begin to focus on the overall implications of the new reproductive biotechnology—*in vitro* fertilization, preservation of sperm and eggs, embryo implantation and the like. The problem is how to enjoy the benefits of the technology—especially for infertile couples—while minimizing the risk of abuse. The problem can be addressed only when society decides what its values and objectives are in this troubling, yet promising, area.

The judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

*For affirmance in part, reversal in part and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

# APPENDIX A

## SURROGATE PARENTING AGREEMENT

THIS AGREEMENT is made this 6ᵗʰ day of *February*, 19 85, by and between MARY BETH WHITEHEAD, a married woman (herein referred to as "Surrogate"), RICHARD WHITEHEAD, her husband (herein referred to a "Husband"), and WILLIAM STERN, (herein referred to as "Natural Father").

### RECITALS

THIS AGREEMENT is made with reference to the following facts:

(1) WILLIAM STERN, Natural Father, is an individual over the age of eighteen (18) years who is desirous of entering into this Agreement.

(2) The sole purpose of this Agreement is to enable WILLIAM STERN and his infertile wife to have a child which is biologically related to WILLIAM STERN.

(3) MARY BETH WHITEHEAD, Surrogate, and RICHARD WHITEHEAD, her husband, are over the age of eighteen (18) years and desirous of entering into this Agreement in consideration of the following:

NOW THEREFORE, in consideration of the mutual promises contained herein and the intentions of being legally bound hereby, the parties agree as follows:

1. MARY BETH WHITEHEAD, Surrogate, represents that she is capable of conceiving children. MARY BETH WHITEHEAD understands and agrees that in the best interest of the child, she will not form or attempt to form a parent-child relationship with any child or children she may conceive, carry to term and give birth to, pursuant to the provisions of this Agreement, and shall freely surrender custody to WILLIAM STERN, Natural Father, immediately upon birth of the child; and terminate all parental rights to said child pursuant to this Agreement.

2. MARY BETH WHITEHEAD, Surrogate, and RICHARD WHITEHEAD, her husband, have been married since 12/2/73, and RICHARD WHITEHEAD is in agreement with the purposes, intents and provisions of this Agreement and acknowledges that his wife, MARY BETH WHITEHEAD, Surrogate, shall be artificially inseminated pursuant to the provisions of this Agreement. RICHARD WHITEHEAD agrees that in the best interest of the child, he will not form or attempt to form a parent-child relationship with any child or children MARY BETH WHITEHEAD, Surrogate, may conceive by artificial insemination as described herein, and agrees to freely and readily surrender immediate custody of the child to WILLIAM STERN, Natural Father; and terminate his parental rights; RICHARD WHITEHEAD further acknowledges he will do all acts necessary to rebut the presumption of paternity of any offspring conceived and born pursuant to aforementioned agreement as provided by law, including blood testing and/or HLA testing.

3. WILLIAM STERN, Natural Father, does hereby enter into this written contractual Agreement with MARY BETH WHITEHEAD, Surrogate, where MARY BETH WHITEHEAD shall be artificially inseminated with the semen of WILLIAM STERN by a physician. MARY BETH WHITEHEAD, Surrogate, upon becoming pregnant, acknowledges that she will carry said embryo/fetus(s) until delivery. MARY BETH WHITEHEAD, Surrogate, and RICHARD WHITEHEAD, her husband, agree that they will cooperate with any background investigation into the

Surrogate's medical, family and personal history and warrants the information to be accurate to the best of their knowledge. MARY BETH WHITEHEAD, Surrogate, and RICHARD WHITEHEAD, her husband, agree to surrender custody of the child to WILLIAM STERN, Natural Father, immediately upon birth, acknowledging that it is the intent of this Agreement in the best interests of the child to do so; as well as institute and cooperate in proceedings to terminate their respective parental rights to said child, and sign any and all necessary affidavits, documents, and the like, in order to further the intent and purposes of this Agreement. It is understood by MARY BETH WHITEHEAD, and RICHARD WHITEHEAD, that the child to be conceived is being done so for the sole purpose of giving said child to WILLIAM STERN, its natural and biological father. MARY BETH WHITEHEAD and RICHARD WHITEHEAD agree to sign all necessary affidavits prior to and after the birth of the child and voluntarily participate in any paternity proceedings necessary to have WILLIAM STERN'S name entered on said child's birth certificate as the natural or biological father.

4. That the consideration for this Agreement, which is compensation for services and expenses, and in no way is to be construed as a fee for termination of parental rights or a payment in exchange for a consent to surrender the child for adoption, in addition to other provisions contained herein, shall be as follows:

(A) $10,000 shall be paid to MARY BETH WHITEHEAD, Surrogate, upon surrender of custody to WILLIAM STERN, the natural and biological father of the child born pursuant to the provisions of this Agreement for surrogate services and expenses in carrying out her obligations under this Agreement;

(B) The consideration to be paid to MARY BETH WHITEHEAD, Surrogate, shall be deposited with the Infertility Center of New York (hereinafter ICNY), the representative of WILLIAM STERN, at the time of the signing of this Agreement, and held in escrow until completion of the duties and obligations of MARY BETH WHITEHEAD, Surrogate, (see Exhibit "A" for a copy of the Escrow Agreement), as herein described.

(C) WILLIAM STERN, Natural Father, shall pay the expenses incurred by MARY BETH WHITEHEAD, Surrogate, pursuant to her pregnancy, more specifically defined as follows:

(1) All medical, hospitalization, and pharmaceutical, laboratory and therapy expenses incurred as a result of MARY BETH WHITEHEAD'S pregnancy, not covered or allowed by her present health and major medical insurance, including all extraordinary medical expenses and all reasonable expenses for treatment of any emotional or mental conditions or problems related to said pregnancy, but in no case shall any such expenses be paid or reimbursed after a period of six (6) months have elapsed since the date of the termination of the pregnancy, and this Agreement specifically excludes any expenses for lost wages or other non-itemized incidentals (see Exhibit "B") related to said pregnancy.

(2) WILLIAM STERN, Natural Father, shall not be responsible for any latent medical expenses occurring six (6) weeks subsequent to the birth of the child, unless the medical problem or abnormality incident thereto was known and treated by a physician prior to the expiration of said six (6) week period and in written notice of the same sent to ICNY, as representative of WILLIAM STERN by certified mail, return receipt requested, advising of this treatment.

(3) WILLIAM STERN, Natural Father, shall be responsible for the total costs of all paternity testing. Such paternity testing may, at the option of WILLIAM STERN, Natural Father, be required prior to release of the surrogate fee from escrow. In the event WILLIAM STERN, Natural Father, is conclusively determined not to be the biological father of the child as a result of an HLA test, this Agreement will be deemed breached and MARY BETH

WHITEHEAD, Surrogate, shall not be entitled to any fee. WILLIAM STERN, Natural Father, shall be entitled to reimbursement of all medical and related expenses from MARY BETH WHITEHEAD, Surrogate, and RICHARD WHITEHEAD, her husband.

(4) MARY BETH WHITEHEAD'S reasonable travel expenses incurred at the request of WILLIAM STERN, pursuant to this Agreement.

5. MARY BETH WHITEHEAD, Surrogate, and RICHARD WHITEHEAD, her husband, understand and agree to assume all risks, including the risk of death, which are incidental to conception, pregnancy, childbirth, including but not limited to, postpartum complications. A copy of said possible risks and/or complications is attached hereto and made a part hereof (see Exhibit "C").

6. MARY BETH WHITEHEAD, Surrogate, and RICHARD WHITEHEAD, her husband, hereby agree to undergo psychiatric evaluation by JOAN EINWOHNER, a psychiatrist as designated by WILLIAM STERN or an agent thereof. WILLIAM STERN shall pay for the cost of said psychiatric evaluation. MARY BETH WHITEHEAD and RICHARD WHITEHEAD shall sign, prior to their evaluations, a medical release permitting dissemination of the report prepared as a result of said psychiatric evaluations to ICNY or WILLIAM STERN and his wife.

7. MARY BETH WHITEHEAD, Surrogate, and RICHARD WHITEHEAD, her husband, hereby agree that it is the exclusive and sole right of WILLIAM STERN, Natural Father, to name said child.

8. "Child" as referred to in this Agreement shall include all children born simultaneously pursuant to the inseminations contemplated herein.

9. In the event of the death of WILLIAM STERN, prior or subsequent to the birth of said child, it is hereby understood and agreed by MARY BETH WHITEHEAD, Surrogate, and RICHARD WHITEHEAD, her husband, that the child will be placed in the custody of WILLIAM STERN'S wife.

10. In the event that the child is miscarried prior to the fifth (5th) month of pregnancy, no compensation, as enumerated in paragraph 4(A), shall be paid to MARY BETH WHITEHEAD, Surrogate. However, the expenses enumerated in paragraph 4(C) shall be paid or reimbursed to MARY BETH WHITEHEAD, Surrogate. In the event the child is miscarried, dies or is stillborn subsequent to the fourth (4th) month of pregnancy and said child does not survive, the Surrogate shall receive $1,000.00 in lieu of the compensation enumerated in paragraph 4(A). In the event of a miscarriage or stillbirth as described above, this Agreement shall terminate and neither MARY BETH WHITEHEAD, Surrogate, nor WILLIAM STERN, Natural Father, shall be under any further obligation under this Agreement.

11. MARY BETH WHITEHEAD, Surrogate, and WILLIAM STERN, Natural Father, shall have undergone complete physical and genetic evaluation, under the direction and supervision of a licensed physician, to determine whether the physical health and well-being of each is satisfactory. Said physical examination shall include testing for venereal diseases, specifically including but not limited to, syphilis, herpes and gonorrhea. Said venereal disease testing shall be done prior to, but not limited to, each series of inseminations.

12. In the event that pregnancy has not occurred within a reasonable time, in the opinion of WILLIAM STERN, Natural Father, this Agreement shall terminate by written notice to MARY BETH WHITEHEAD, Surrogate, at the residence provided to the ICNY by the Surrogate, from ICNY, as representative of WILLIAM STERN, Natural Father.

13. MARY BETH WHITEHEAD, Surrogate, agrees that she will not abort the child once conceived except, if in the professional medical opinion of the inseminating physician, such action is necessary for the physical health of MARY BETH WHITEHEAD or the child has been determined by said physician to be physiologically abnormal. MARY BETH WHITEHEAD further agrees, upon the request of said physician to undergo amniocentesis (see Exhibit "D") or similar tests to detect genetic and congenital defects. In the event said test reveals that the fetus is genetically or congenitally abnormal, MARY BETH WHITEHEAD, Surrogate, agrees to abort the fetus upon demand of WILLIAM STERN, Natural Father, in which event, the fee paid to the Surrogate will be in accordance to Paragraph 10. If MARY BETH WHITEHEAD refuses to abort the fetus upon demand of WILLIAM STERN, his obligations as stated in this Agreement shall cease forthwith, except as to obligations of paternity imposed by statute.

14. Despite the provisions of Paragraph 13, WILLIAM STERN, Natural Father, recognizes that some genetic and congenital abnormalities may not be detected by amniocentesis or other tests, and therefore, if proven to be the biological father of the child, assumes the legal responsibility for any child who may possess genetic or congenital abnormalities. (See Exhibits "E" and "F").

15. MARY BETH WHITEHEAD, Surrogate, further agrees to adhere to all medical instructions given to her by the inseminating physician as well as her independent obstetrician. MARY BETH WHITEHEAD also agrees not to smoke cigarettes, drink alcoholic beverages, use illegal drugs, or take non-prescription medications or prescribed medications without written consent from her physician. MARY BETH WHITEHEAD agrees to follow a prenatal medical examination schedule to consist of no fewer visits than: one visit per month during the first seven (7) months of pregnancy, two visits (each to occur at two-week intervals) during the eighth and ninth month of pregnancy.

16. MARY BETH WHITEHEAD, Surrogate, agrees to cause RICHARD WHITEHEAD, her husband, to execute a refusal of consent form as annexed hereto as Exhibit "G".

17. Each party acknowledges that he or she fully understands this Agreement and its legal effect, and that they are signing the same freely and voluntarily and that neither party has any reason to believe that the other(s) did not freely and voluntarily execute said Agreement.

18. In the event any of the provisions of this Agreement are deemed to be invalid or unenforceable, the same shall be deemed severable from the remainder of this Agreement and shall not cause the invalidity or unenforceability of the remainder of this Agreement. If such provision shall be deemed invalid due to its scope or breadth, then said provision shall be deemed valid to the extent of the scope or breadth permitted by law.

474

19. The original of this Agreement, upon execution, shall be retained by the Infertility Center of New York, with photocopies being distributed to MARY BETH WHITEHEAD, Surrogate and WILLIAM STERN, Natural Father, having the same legal effect as the original.

_William Stern_
WILLIAM STERN
Natural Father

2/6/85
DATE

STATE OF New York)
 ) SS.:
COUNTY OF New York()

On the 6th day of February , 1985, before me personally came WILLIAM STERN, known to me, and to me known, to be/the individual described in the foregoing instrument and he acknowledged to me that he executed the same as his free and voluntary act.

_Donna Juselic_
NOTARY PUBLIC

## APPENDIX B

We have read the foregoing five pages of this Agreement, and it is our collective intention by affixing our signatures below, to enter into a binding legal obligation.

Mary Beth Whitehead
MARY BETH WHITEHEAD, Surrogate

1-30-85
DATE

Richard Whitehead
RICHARD WHITEHEAD
Surrogate's Husband

1.30.85
DATE

STATE OF *New York*
COUNTY OF *Nassau* ) SS.:

On the 6th day of February, 19 85, before me personally came MARY BETH WHITEHEAD, known to me, and to me known to be the individual described in the foregoing instrument and she acknowledged to me that she executed the same as her free and voluntary act.

NOTARY PUBLIC

STATE OF *New York* )
COUNTY OF *New York* ) SS.:

On the 6th day of February, 19 85, before me personally came RICHARD WHITEHEAD, known to me, and to me known to be the individual described in the foregoing instrument and he acknowledged to me that he executed the same as his free and voluntary act.

NOTARY PUBLIC

476

**AGREEMENT**

THIS AGREEMENT is made this _THIRD_ day of _DECEMBER_ 19 _84_, by and between _WILLIAM STERN_ hereinafter referred to as Natural Father, and the Primary Research Associates of United States, Inc., d/b/a Infertility Center of New York, (hereinafter referred to as "ICNY").

WHEREAS, Natural Father is desirous of taking part in the process of surrogate parenting wherein he will attempt to conceive a child by artificial insemination of a surrogate mother;

WHEREAS, ICNY is a corporation duly organized and existing under the laws of the State of New York for the purpose inter alia of engaging in research, developmental work and design in the areas of surrogate parenting, ovum transfer and in vitro fertilization with implantation in a surrogate; and additionally providing administrative and supportive services for the above; and

WHEREAS, Natural Father is desirous of contracting with ICNY for such services; and

. WHEREAS ICNY is desirous of contracting with the Natural Father to provide such services;

NOW THEREFORE, in consideration of the mutual promises contained herein, and with the intentions of being legally bound hereby, the parties mutually agree as follows:

(1) Natural Father hereby contracts with ICNY for the services offered by ICNY and ICNY agrees to contract with the Natural Father to use its best efforts to assist the Natural Father in the selection of a "surrogate mother" as hereinafter defined, it being understood that the final selection of the "surrogate mother" is solely within the discretion of the Natural Father. In addition to assisting the Natural Father in the selection of a "surrogate mother", ICNY shall also provide the services set forth in Exhibit "A" annexed hereto and made a part hereof and these services shall continue until the completion of the duties and obligations of surrogate or until such time as the Natural Father decides not to utilize ICNY's services, provided that the Natural Father is not in breach of this Agreement.

(2) Natural Father agrees and understands that he must enter into an agreement with the selected surrogate mother whereby Natural Father agrees to the process of artificial insemination with the use of his semen for the purpose of impregnating the surrogate mother. Thereafter, the surrogate mother shall give birth to a child fathered by the Natural Father and voluntarily surrender custody of said child to the Natural Father.

(3) Natural Father hereby agrees to pay ICNY as compensation for the services provided by ICNY the sum of SEVEN THOUSAND FIVE HUNDRED DOLLARS ($7,500.00) incurred by ICNY on behalf of the Natural Father. The Natural Father understands and agrees that said sum is non-refundable. A partial list of costs and expenses is annexed hereto and made a part hereof as Exhibit "B". ICNY shall on a periodic basis bill the Natural Father for the costs and expenses incurred on behalf of the Natural Father.

The Natural Father agrees that ICNY shall act as escrow agent for the fee to be paid by the Natural Father to the selected surrogate mother.

(4) The following list of definitions shall apply throughout this Agreement:

(a) "Child" is defined as all children born simultaneously as a result of the insemination contemplated by this Agreement.

(b) "Natural Father" is defined as the individual over the age of eighteen (18) who has selected the surrogate mother and whose semen is used in the insemination contemplated herein resulting in the birth of the child.

(c) "Surrogate mother" is defined as a woman over the age of eighteen (18) selected by the Natural Father to be impregnated by the process of artificial insemination with semen of the Natural Father for the purpose of becoming pregnant and giving birth to a child and surrendering the child to the Natural Father.

(5) ICNY agrees to provide the services detailed in Exhibit "A". Said services including the offering, at the option of the Natural Father, of legal representation of the Natural Father in his negotiations and agreement with the surrogate mother. The Natural Father understands and acknowledges that ICNY offers these legal services through the law firm retained by ICNY but, ICNY makes no representations or warranties with respect to matters of law or the legality of surrogate parenting and is not rendering legal services or providing legal advice. However, the Natural Father has the absolute right to seek legal counsel of his own selection in his negotiations and agreement with the selected surrogate mother or her representative. In the event the Natural Father utilizes the legal services of counsel other than the law firm retained by ICNY, all legal fees and cost shall be borne by the Natural Father and such fees and costs shall be in addition to the fees and costs set forth in Paragraph 3 of this Agreement.

(6) Prior to signing this Agreement, each party has been given the opportunity to consult with an attorney of his own choice concerning the terms and legal significance of the Agreement, and the effect which it has upon any and all interests of the parties. Each party acknowledges that he fully understands the Agreement and its legal effect, and that he is signing the same freely and voluntarily and that neither party has any reason to believe that the other did not understand fully the terms and effects of this Agreement, or that he did not freely and voluntarily execute this Agreement.

(7) Natural Father warrants and represents the following to ICNY:

(a) That the Natural Father's semen is of sufficient nature both quantitatively and qualitatively to impregnate the selected surrogate mother.

(b) That the Natural Father is medically free from disease or other hereditary medical problems which could cause injury, defect, or disease to the surrogate mother or child.

(c) That the Natural Father will not make or attempt to make directly or through a representative, a subsequent agreement with the selected surrogate mother or any other surrogates introduced to the Natural Father by ICNY before or at any time after the birth of his child. In the event of a further arrangement with the surrogate for a child is made, the Natural Father agrees to pay to ICNY a second fee in the amount specified in Paragraph 3 of this Agreement.

(8) Natural Father agrees that breach of any of his warranties and representations shall cause this Agreement to immediately terminate but in no way relieve the Natural Father from his obligations under this Agreement. Further, the Natural Father agrees that his warranties and representations shall survive the termination of this Agreement.

(9) Natural Father hereby acknowledges that ICNY makes no representations or warranties with respect to any agreement or understanding which may be reached, or may have been reached, between himself and a prospective "surrogate mother." Natural Father further acknowledges that the nature of any such agreement or understanding as well as all ramifications, obligations and enforcement matters relating thereto are subjects which he must seek advice from his attorney.

(10) It is expressly understood that ICNY does not guarantee or warrant that the "surrogate mother" will in fact conceive a child fathered by Natural Father; nor does ICNY guarantee or warrant that if a child is conceived, it will be a healthy child, free from all defects; nor does ICNY guarantee or warrant the "surrogate mother" (and her husband, if applicable) will comply with the terms and provisions of the separate agreement entered into between herself and Natural Father including but not limited to, the "surrogate mother's" refusal to surrender custody of the child upon birth.

(11) Natural Father hereby specifically releases ICNY and its officers, employees, agents and representatives from any and all liability and responsibility of any nature whatsoever except willful and gross negligence, which may result from complications, breaches, damages, losses, claims, actions, liabilities, whether actual or asserted of any kind, and all other costs or detriments of any kind, in any way related to or arising from any agreement or understanding between himself and a "surrogate mother" located through the services of ICNY. Moreover, the Natural Father understands the relationship between ICNY and the relationship of the doctors used in connection with insemination, monitoring and any other medical or psychiatric procedure or treatment of the surrogate or of the child is that of an independent contractor and that there is no other relationship between the parties.

(12) This Agreement is binding on each party's respective executors, heirs, assigns and successors.

(13) This Agreement has been drafted, negotiated and executed in New York, New York, and shall be governed by, continued and enforced in accordance with the laws of the State of New York.

(14) In the event any of the provisions of this Agreement are deemed to be invalid or unenforceable, the same shall be deemed severable from the remainder of this Agreement and shall not cause the invalidity or unenforceability of the remainder of this Agreement. If such provision(s) shall be deemed invalid due to its scope or breadth, then said provision(s) shall be deemed valid to the extent of the scope or breadth permitted by law.

Charles R. Gordon, M.D.
Witness

Susan Feldman Gordon, Esq
Witness

William Stein
Natural Father

By: Lonnie Ferselline
PRIMARY RESEARCH ASSOCIATES
OF UNITED STATES, INC. d/b/a
INFERTILITY CENTER OF NEW
YORK